Andre K. Cizmarik
EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendant
750 Lexington Avenue, 8th floor
New York, NY 10022
(212) 308-4411

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

WALLER CAPITAL PARTNERS, LLC,

        Plaintiff,

    Versus

PUERTO RICO CABLE HOLDING
COMPANY INC.,

        Defendant.

----------------------------------------------------------x

No.

**08 CIV 8940**

**Judge Hellerstein**

U.S.D.C. S.D. N.Y.
CASHIERS

**NOTICE OF REMOVAL**

    Defendant Puerto Rico Cable Holding Company Inc. ("PRCHC") hereby removes this

action to this Court on the following grounds:

    1.    Plaintiff Waller Capital Partners, LLC ("Waller Capital") commenced this action

by filing its Complaint on or about September 5, 2008.  No further pleadings have been filed and

no other proceeding has taken place in this action.

    2.    Waller Capital caused the Summons and Complaint to be delivered to the office

of counsel for Defendant PRCHC on Friday, September 19, 2008 and, through counsel, PRCHC

accepted service, waiving formal service of process, on Monday, September 22, 2008.  Removal

is therefore timely.  Copies of the Summons and Complaint are attached.

    3.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332 and

1441.  On information and belief, plaintiff Waller Capital is a New York limited liability

company with its principal place of business in New York. On information and belief, the

managing member of Waller Capital is a citizen of New Jersey, and, to the extent Waller Capital

has any other members, none are citizens of Puerto Rico. Defendant PRCHC is a Puerto Rico

corporation with its principal place of business in Puerto Rico. The amount in controversy

exceeds the sum of $75,000, exclusive of interest and costs, as plaintiff Waller Capital has

alleged in its Complaint damages in excess of $1.6 million.

4.      Written notice of the filing of this notice of removal shall be served upon counsel

for plaintiff Waller Capital and filed with the Clerk of the Supreme Court of the State of New

York, County of New York, promptly after the filing of this notice of removal.

Dated: New York, NY
       October 17, 2008

Andre K. Cizmarik
EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendant
750 Lexington Avenue, 8th floor
New York, NY 10022
(212) 308-4411

Of Counsel:

Steven M. Cowley
Stephanie A. Bruce
EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendant
111 Huntington Avenue
Boston, MA 02199
(617) 239-0100

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------ X
                                  :

WALLER CAPITAL PARTNERS, LLC,     :    Index No. Purchased
                                  :    September 5, 2008
                      Plaintiff,  :
                                  :

            - against -           :    Index No. 602589/08
                                  :

PUERTO RICO CABLE HOLDING COMPANY  :    **SUMMONS**
INC.,                                  :
                                  :    Plaintiff designates
                    Defendant.  :    New York County as
                                  :    the place of trail
------------------------------------------------------ X

To    Puerto Rico Cable Holdings Company, Inc.
       Spectrum Equity Investors V, LP
       One International Place, 29th Floor
       Boston, Massachusetts 02110

          YOU ARE HEREBY SUMMONED to answer the Complaint in this action and to

serve a copy of your answer upon Nixon Peabody LLP, attorneys for plaintiff, Waller Capital

Partners, LLC within 20 (twenty) days after service of this summons, exclusive of the date of

service, or within 30 (thirty) days after service is complete if this Summons is not personally

delivered to you within the State of New York. In case of your failure to answer, judgment will

be taken against you by default for the relief demanded in the Complaint.

NEW YORK
COUNTY CLERK'S OFFICE

SEP. 0 5 2008

NOT COMPARED
WITH COPY FILED

The basis of venue is Plaintiff's place of business, located at 30 Rockefeller Plaza, Suite 4350, New York, New York 10112.

Dated: September 5, 2008

NIXON PEABODY LLP

By:  *Eileen M. Cunfl*
Eileen M. Cunningham

437 Madison Avenue
New York, New York 10022
(212) 940-3000

Attorneys for Plaintiff
Waller Capital Partners, LLC

Of Counsel:

Christopher M. Mason
Matthew C. Peluso

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY
--------------------------------------------------------------- X
                                      :

WALLER CAPITAL PARTNERS, LLC,      :

                          Plaintiff,   :

               - against -           :    Index No. 602589/08

                                        :
PUERTO RICO CABLE HOLDING COMPANY   :    COMPLAINT
INC.,                                        
                                        :

                          Defendant. :
                                        :
--------------------------------------------------------------- X

            Plaintiff Waller Capital Partners, LLC ("Waller Capital"), for its Complaint in

this action, alleges and states that:

            1.      Defendant Puerto Rico Cable Holding Company Inc. ("PR Cable

Holdings") has breached its contract with Waller Capital or unjustly enriched itself at Waller

Capital's expense by retaining Waller Capital to help sell PR Cable Holdings' declining cable

television business in Puerto Rico and then, after Waller Capital had run a private sales process

and identified the eventual purchaser as the best potential purchaser, terminating the contractual

relationship with Waller Capital and concluding a transaction (or a similar transaction) involving

the same assets with that same buyer—all without ever paying Waller Capital anything,

including the amounts required by the contract with Waller Capital.

The Parties

            2.      Waller Capital is a New York limited liability company with its principal

place of business in New York.

NEW YORK
COUNTY CLERK'S OFFICE

SEP 0 5 2008

NOT COMPARED
WITH COPY FILED

3.    PR Cable Holdings is a Puerto Rico corporation with its principal place of business in Puerto Rico.

### The Letter Agreement

4.    On or about April 3, 2007, Waller Capital and PR Cable Holdings, on behalf of itself and others, entered into a written contract (the "Letter Agreement"). A true copy of the Letter Agreement is attached as Exhibit A to this Complaint.

5.    In the Letter Agreement, PR Cable Holdings, for itself and the others in the Company defined in the Letter Agreement, agreed to pay Waller Capital a fee for services to be provided, including services towards a transaction with a third party or parties in which the subject matter would be PR Cable Holdings' Puerto Rico cable television business, a business known as Choice Cable TV.

6.    The parties to the Letter Agreement contemplated that they would work toward a transaction (the "Transaction") in which Puerto Rico Cable Acquisition Company Inc. d/b/a Choice Cable TV, then a wholly-owned subsidiary of PR Cable Holdings—or its stock or assets, in whole or in part—might be sold to or merged into or consolidated with a third party or parties.

7.    In paragraph 3 of the Letter Agreement, the parties defined "Transaction Fee" as 1.0% of the first $250 million of Total Value, plus 2.0% of the next $50 million of Total Value, plus 3.0% of any Total Value in excess of $300 million, computed based on the aggregate value involved in a Transaction, regardless of how allocated or the form of consideration, without duplication.

8.    The intention of the parties to the Letter Agreement, as set forth in its paragraph 3, was that "the Transaction Fee will be computed based upon the aggregate value

- 2 -

involved in a Transaction regardless of how allocated or the form of consideration, without duplication."

9.     Total Value for purposes of calculating a Transaction Fee under the Letter Agreement is therefore the aggregate value involved in a Transaction (or, under certain circumstances, the aggregate value involved in a similar transaction involving the subject matter of the Transaction defined in the Letter Agreement).

10.     In paragraph 4 of the Letter Agreement, the Company agrees to reimburse Waller Capital, upon request, for Waller Capital's reasonable out-of-pocket costs and expenses in connection with Waller Capital's services under the Letter Agreement.

11.     In paragraph 11(e) of the Letter Agreement, the Company agrees that Waller Capital shall be entitled to recover, in addition to any other appropriate amounts, reasonable attorneys' fees, costs, and expenses upon prevailing in this action.

12.     In paragraph 8 of the Letter Agreement, the parties included provisions to protect Waller Capital so that, after it began working with a potential third party for a Transaction, the Company could not simply terminate the Letter Agreement and do a deal with that third party without Waller Capital's help, and thus potentially avoid paying Waller Capital a fee.

13.     In paragraph 8 of the Letter Agreement, the Company agrees to pay Waller Capital a Transaction Fee if, at any time prior to the expiration of six months after termination of the Letter Agreement, the Company either completes a Transaction or a similar transaction, or enters into a definitive agreement relating to a similar transaction involving the subject matter of the Transaction.

Waller Capital's Initial Efforts on Behalf of the Company To Sell Choice Cable TV

14.    Following execution of the Letter Agreement, Waller Capital began efforts to develop interest among third parties in Choice Cable TV.

15.    With the assistance of the Company, Waller Capital prepared a Confidential Information Memorandum (the "Choice Cable Book") dated as of May, 2007 with respect to Choice Cable TV. A true copy of the Choice Cable Book is attached as Exhibit B to this Complaint.

16.    The Company consented to the contents of the Choice Cable Book.

17.    The Choice Cable Book defined PR Cable Holdings as "d/b/a Choice Cable TV, 'Choice'."

18.    The Choice Cable Book described the persons or entities that would receive the Choice Cable Book as "potential purchasers" of PR Cable Holdings "d/b/a Choice Cable TV, 'Choice'."

19.    On behalf of the Company, Waller Capital contacted over 100 prospects to determine potential interest in Choice Cable TV.

20.    On behalf of the Company, Waller Capital obtained nondisclosure agreements from forty of the prospects for Choice Cable TV and sent them, as potential purchasers, the Choice Cable Book.

21.    On behalf of the Company, Waller Capital received and analyzed indications of further interest from eleven of the potential purchasers who received the Choice Cable Book.

-4-

22.     On behalf of the Company, and with the knowledge and participation of

the Company, Waller Capital selected seven potential purchasers to be given additional access to

information and due diligence about Choice Cable TV.

23.     On behalf of the Company, Waller Capital actively organized and

participated in further sales efforts, including meetings in Puerto Rico, with the seven potential

purchasers selected to be given additional access to information and due diligence about Choice

Cable TV.

24.     One of the over 100 prospects which Waller Capital originally contacted,

one of the forty potential purchasers from whom Waller Capital then obtained a nondisclosure

agreement and to which Waller Capital sent the Choice Cable Book, one of the eleven potential

purchasers who then indicated further interest in Choice Cable TV, and one of the seven

potential purchasers who then met with Waller Capital in Puerto Rico and was given additional

access to information and due diligence about Choice Cable TV, was Spectrum Equity Investors.

("Spectrum").

25.     Spectrum's principal place of business is One International Place, Boston,

Massachusetts.

26.     Spectrum raised five investment funds representing $4 billion of private

equity capital.

27.     Spectrum's funds provide equity capital in a wide variety of transactions,

including leveraged buyouts, recapitalizations and dividends, acquisition financings, and

secondary share purchases.

28.     Waller Capital introduced Spectrum to the Company for purposes of a possible Transaction involving Choice Cable TV and Spectrum through one or more of Spectrum's funds.

29.     Waller Capital provided advice and assistance to the Company with respect to Spectrum's possible interest in Choice Cable TV.

30.     With the knowledge and consent of the Company, Waller Capital provided Spectrum with the Choice Cable Book.

31.     On or about May 21, 2007, with the knowledge and consent of the Company, Waller Capital sent Spectrum a letter inviting Spectrum to submit a preliminary indication of interest in a Transaction, defined as the sale of PR Cable Holdings "d/b/a Choice Cable TV." A true copy of that letter is attached as Exhibit C to this Complaint.

32.     Following Waller Capital's initial efforts to interest Spectrum in acquiring Choice Cable TV, Spectrum submitted a preliminary indication of interest in a Transaction for the acquisition of Choice Cable TV.

33.     On or about June 23, 2007, with the knowledge and consent of the Company, and in response to Spectrum's indications of interest, Waller Capital sent Spectrum a letter inviting Spectrum to submit a binding offer for Choice Cable TV. A true copy of that letter is attached as Exhibit D to this Complaint.

Spectrum's Reaction to Continuing Poor Performance by Choice Cable TV

34.     During Waller Capital's efforts to maintain Spectrum's interest in acquiring Choice Cable TV, the number of monthly video subscribers to Choice Cable TV was declining.

35.    The number of monthly video subscribers to Choice Cable TV declined in May, 2007.

36.    The number of monthly video subscribers to Choice Cable TV declined in June, 2007.

37.    The number of monthly video subscribers to Choice Cable TV declined in July, 2007.

38.    Despite substantial indications of interest in acquiring Choice Cable TV, Spectrum did not make a binding offer for Choice Cable TV in July, 2007 due, upon information and belief, in large part to the continuing decline in monthly video subscribers to Choice Cable TV.

39.    Instead, Spectrum sent a letter to Waller Capital expressing firm interest in discussing the acquisition of Choice Cable TV for a price of approximately $185,000,000. A letter dated as of July 31, 2007 from Spectrum to this effect (the "Confirmatory Letter") is attached as Exhibit E to this Complaint.

40.    On or about August 3, 2007, Spectrum and PR Cable Holdings entered into a letter agreement (the "Exclusivity Agreement") giving one of Spectrum's funds, Spectrum Equity Investors V, L.P. ("Spectrum V"), the exclusive right to negotiate for Choice Cable TV, through August 23, 2007, based on Spectrum's earlier Confirmatory Letter. A true copy of the Exclusivity Agreement is attached as Exhibit F to this Complaint.

41.    The parties to the Exclusivity Agreement defined the possible transaction at issue as simply any "potential transaction . . . involving the Company and its subsidiary (the 'Company')."

-7-

42.     The transaction which the parties to the Exclusivity Agreement forbade the Company to discuss, negotiate, communicate, or participate in during its term was "any proposal, inquiry or offer from any person other than Spectrum or any of its affiliates (i) regarding the transfer or sale of assets (other than in the ordinary course of business) or stock of the Company or (ii) with respect to any merger, business combination, consolidation with the Company."

43.     Spectrum V allowed the Exclusivity Agreement to expire on August 23, 2007 without making a binding offer to the Company for a Transaction.

44.     On or about August 24, 2007, at Spectrums' request and with the knowledge of the Company, Waller Capital sent Spectrum the monthly Choice Cable TV subscriber activity for August.

45.     The number of monthly video subscribers to Choice Cable TV declined in August, 2007.

46.     On or about August 28, 2007, Spectrum informed Waller Capital that despite the expiration of the Exclusivity Period, Spectrum was still interested in acquiring Choice Cable TV, but wanted to see the September Choice Cable TV subscriber activity first.

47.     Waller Capital informed the Company of the continued interest of Spectrum in acquiring Choice Cable TV.

The Company Terminates the Letter Agreement, but Continues To Use Waller Capital's Services

48.     On or about September 12, 2007, the Company, through PR Cable Holdings, terminated Waller Capital's services under the Letter Agreement. A true copy of a letter from PR Cable Holdings to this effect is attached as Exhibit G to this Complaint.

49.    Following termination of Waller Capital's services under the Letter Agreement, and with the knowledge and cooperation of the Company, Waller Capital continued to discuss with Spectrum a possible acquisition of Choice Cable TV by Spectrum.

50.    Following termination of Waller Capital's services under the Letter Agreement, Spectrum continued to contact Waller Capital (including in a face-to-face meeting) and to express interest in acquiring Choice Cable TV.

51.    Following termination of Waller Capital's services under the Letter Agreement, Spectrum asked Waller Capital if it could obtain the Choice Cable TV subscriber activity for September 2007.

52.    Following termination of Waller Capital's services under the Letter Agreement, the Company indicated that Waller Capital should communicate the Choice Cable TV subscriber activity for September, 2007 to Spectrum.

53.    The September, 2007 Choice Cable TV subscriber activity showed material improvement over the rate of decline in video subscribers for August, 2007.

54.    Waller Capital communicated the September, 2007 Choice Cable TV subscriber activity to Spectrum.

55.    On or about October 2, 2007, after discussing with the Company what position should be communicated to Spectrum, Waller Capital met again with Spectrum to discuss Spectrum's continued interest in acquiring Choice Cable TV.

56.    On or about October 4, 2007, in response to the communications between Waller Capital and Spectrum following termination of Waller Capital's services under the Letter Agreement, Spectrum sent a term sheet (the "October Term Sheet") for a Transaction in which

Spectrum would acquire Choice Cable TV. A true copy of this term sheet and its cover e-mail is attached as Exhibit H to this Complaint.

      57.    Waller Capital discussed the October Term Sheet with the Company.

      58.    Waller Capital provided advice to the Company concerning the Transaction contemplated by the October Term Sheet.

      59.    With the knowledge and cooperation of the Company, and for the benefit of the Company, Waller Capital discussed the October Term sheet with Spectrum in a conference call that included Spectrum and the Company.

Spectrum V Acquires Choice Cable TV
In a Transaction Involving an Aggregate Value of $160,000,000 or More

      60.    Within six months after September 12, 2007, PR Cable Holdings entered into a definitive agreement with Spectrum V for Spectrum V to acquire Choice Cable TV.

      61.    In particular, on or about December 11, 2007, PR Cable Holdings and various of its affiliates entered into an agreement and plan of merger with PPR Media LLC ("PPR Media") and PR Media Acquisition Inc. (the "Merger Agreement").

      62.    PPR Media is a Delaware limited liability company with its principal place of business at One International Place, Boston, Massachusetts.

      63.    Spectrum V, by itself or with an affiliate, Spectrum V Investment Managers' Fund, L.P. (collectively, the "Spectrum Funds"), controls PPR Media.

      64.    The Spectrum Funds designate three of the five members of the Board of PPR Media.

      65.    Upon information and belief, the Spectrum Funds hold the majority of the Class A Preferred Units in PPR Media and are therefore the Majority Investor Members of PPR

- 10 -

Media as defined in a PPR Media LLC Limited Liability Company Agreement dated as of December 11, 2007.

66.     Upon information and belief, PPR Media was formed to acquire and hold the stock of PR Cable Holdings, thus acquiring control of Choice Cable TV.

67.     Upon information and belief, PPR Media planned to partner with the former management team of Patriot Media Consulting, LLC, another Spectrum portfolio company, to invest in Choice Cable TV, assume management control of its operations, make technical and operational improvements in the company, and launch new services and products.

68.     Upon information and belief, the mechanism for the Spectrum transaction reflected in the Merger Agreement was for a shell corporation, PR Media Acquisition Inc., of which PPR Media would own 100%, to merge with PR Cable Holdings, with PR Cable Holdings becoming the surviving corporation.

69.     Upon information and belief, the aggregate value involved in the transaction reflected in the Merger Agreement would be at least the enterprise value of the companies acquired by the Spectrum Funds through PPR Media, without duplication.

70.     The Total Value of the transaction reflected in the Merger Agreement is at least the enterprise value of PR Cable Holdings and Choice Cable TV, without duplication, upon acquisition by the Spectrum Funds.

71.     Enterprise value is commonly understood to be the value of the equity plus net debt (excluding inter-company debt) of a company.

72.     Upon information and belief, the equity in PR Cable Holdings and Choice Cable TV in the transaction reflected in the Merger Agreement is at least $50,000,000.

73.     Upon information and belief, the net debt of PR Cable Holdings and Choice Cable TV amended, assumed, continued, modified, or renegotiated in the transaction reflected in the Merger Agreement is approximately $110,000,000.

74.     Upon information and belief, the enterprise value involved in the transaction reflected in the Merger Agreement is approximately $160,000,000 or more.

75.     Upon information and belief, the aggregate value involved in the transaction reflected in the Merger Agreement is approximately $160,000,000 or more.

### Waller Capital Is Entitled to a Transaction Fee

76.     PR Cable Holdings entered into the Merger Agreement within six months of the termination of the Letter Agreement.

77.     Upon information and belief, the transaction contemplated by the Merger Agreement has closed.

78.     Upon information and belief, the Spectrum Funds have acquired PR Cable Holdings and Choice Cable TV through the transaction reflected in the Merger Agreement.

79.     The transaction contemplated by the Merger Agreement is a Transaction as defined in the Letter Agreement.

80.     If the transaction contemplated by the Merger Agreement is not a Transaction as defined in the Letter Agreement, then the Merger Agreement is a definitive agreement between PR Cable Holdings and Spectrum V relating to a similar transaction involving the subject matter of the Transaction defined in the Letter Agreement.

81.     Waller Capital is entitled to a Transaction Fee as defined by the parties in paragraph 8 of the Letter Agreement because of the transaction contemplated by the Merger Agreement.

82.     Waller Capital is entitled to a Transaction Fee as defined by the parties in
paragraph 8 of the Letter Agreement because of the Merger Agreement.

83.     The Total Value of the transaction to which the Merger Agreement relates
exceeds $160,000,000.

84.     The Transaction Fee with respect to the Total Value of the transaction to
which the Merger Agreement relates exceeds $1,600,000.

### Waller Capital Is Entitled to Its Expenses

85.     During the term of the Letter Agreement, Waller Capital regularly
consulted with the Company concerning out-of-pocket expenses being incurred by Waller
Capital for the benefit of the Company.

86.     On or before September 12, 2007, Waller Capital had incurred reasonable
out-of-pocket expenses of $44,539.59 for the benefit of the Company.

87.     Since September 12, 2007, Waller Capital has expended additional
amounts to enforce the provisions of the Letter Agreement.

### Jurisdiction and Venue

88.     This Court has jurisdiction over PR Cable Holdings pursuant to New York
Civil Practice Law and Rules 301 and 302(a)(1).

89.     Jurisdiction is appropriate in the Commercial Division of this Court
pursuant to Section 202.27 of the Rules of the Commercial Division.

90.     This Court has jurisdiction over PR Cable Holdings pursuant to paragraph
9 of the Letter Agreement.

91.     Venue is proper in this Court pursuant to New York Civil Practice Law
and Rules 503(a) because Waller Capital resides in this County.

- 13 -

92.  Venue is proper in this Court pursuant to paragraph 9 of the Letter

Agreement.

FIRST CAUSE OF ACTION

93.  Waller Capital repeats and realleges paragraphs 1 through 92 above as if

fully set forth below.

94.  Waller Capital has demanded payment of a Transaction Fee. A true copy

of a March 31, 2008 letter to PR Cable Holdings and Spectrum V demanding such payment in

the amount of $1,606,000 is attached as Exhibit I to this Complaint.

95.  PR Cable Holdings has refused to pay Waller Capital a Transaction Fee.

A true copy of a letter from counsel to PR Cable Holdings refusing to pay any Transaction Fee is

attached as Exhibit J to this Complaint.

96.  PR Cable Holdings has breached the Letter Agreement by failing to pay

Waller Capital a Transaction Fee.

97.  Waller Capital has been damaged by PR Cable Holdings' breach of the

Letter Agreement.

SECOND CAUSE OF ACTION

98.  Waller Capital repeats and realleges paragraphs 1 through 92 above as if

fully set forth below.

99.  Waller Capital has demanded reimbursement of its reasonable out-of-

pocket costs and expenses in connection with Waller Capital's services under the Letter

Agreement. A true copy of a March 31, 2008 letter to PR Cable Holdings and Spectrum V

demanding such payment in the amount of $44,539.59 is attached as Exhibit I to this Complaint.

- 14 -

100.    PR Cable Holdings has refused to reimburse Waller Capital its reasonable out-of-pocket costs and expenses in connection with Waller Capital's services under the Letter Agreement.

101.    PR Cable Holdings has breached the Letter Agreement by failing to reimburse Waller Capital its reasonable out-of-pocket costs and expenses in connection with Waller Capital's services under the Letter Agreement.

102.    Waller Capital has been damaged by PR Cable Holdings' breach of the Letter Agreement.

### THIRD CAUSE OF ACTION

103.    Waller Capital repeats and realleges paragraphs 1 through 92 above as if fully set forth below.

104.    Before the termination of the Letter Agreement, Waller Capital provided valuable services to PR Cable Holdings.

105.    After the termination of the Letter Agreement, Waller Capital provided valuable services to PR Cable Holdings.

106.    The services provided by Waller Capital to PR Cable Holdings before termination of the Letter Agreement benefited PR Cable Holdings.

107.    The services provided by Waller Capital to PR Cable Holdings after termination of the Letter Agreement benefited PR Cable Holdings.

108.    The benefit to PR Cable Holdings from the services provided by Waller Capital includes some or all of the value of the transaction contemplated by the Merger Agreement.

109.    PR Cable Holdings has not paid Waller Capital anything for the services provided by Waller Capital.

110.    To the extent Waller Capital is not paid a Transaction Fee for the Merger Agreement or the transaction contemplated by the Merger Agreement, PR Cable Holdings has been unjustly enriched by the services provided by Waller Capital.

WHEREFORE, Waller Capital asks this Court to enter judgment:

A.    On the First Cause of Action, awarding Waller Capital damages of $1,606,000.00 or such other amount as may be determined at trial;

B.    On the Second Cause of Action, awarding Waller Capital damages of $44,539.59 or such other amount as may be determined at trial;

C.    On the Third Cause of Action, awarding Waller Capital damages of $1,650,539.59 or such other amount as may be determined at trial;

D.    Awarding Waller Capital, pursuant to Section 11(e) of the Letter Agreement, its reasonable attorneys' fees, expenses, and costs in connection with this action; and

- 16 -

E.    For such other and further relief as the Court deems just and proper.

Dated:    September 5, 2008

NIXON PEABODY LLP

By:

Christopher M. Mason

437 Madison Avenue
New York, New York 10022
(212) 940-3000

Attorneys for Plaintiff
Waller Capital Partners, LLC

Of Counsel:

Eileen M. Cunningham
Matthew C. Peluso

- 17 -

# Exhibit A

## WALLER CAPITAL PARTNERS, LLC

April 3, 2007

Puerto Rico Cable Holding Company Inc.
c/o HM Capital Partners, LLC
200 Crescent Court, Suite 1600
Dallas, TX 75201
Attn: Eric Lindberg

Dear Eric:

This letter confirms our agreement that Waller Capital Partners, LLC ("Waller") is engaged to assist Puerto Rico Cable Holding Company Inc. and its affiliates (the "Company") in connection with a transaction ("Transaction") whereby Puerto Rico Cable Acquisition Company Inc., a wholly-owned subsidiary of the Company ("PR Cable"), (its stock or assets, in whole or in part) may be sold to or merged into or consolidated with another third party or parties not affiliated with the Company or its affiliates.

1. <u>Services of Waller</u>. In connection with the Transaction, Waller will provide you assistance which will include coordinating due diligence, preparing offering materials, conducting marketing presentations, financial advisory services and making introductions to and solicitations of interest from interested parties. Waller will also assist you with, and participate in, the negotiations concerning the financial aspects of the Transaction. Our engagement hereunder does not include the rendering by us of any opinion with respect to the fairness to the Company or its investors of the consideration to be paid in the Transaction.

2. <u>Exclusivity</u>. The Company hereby authorizes Waller and Waller hereby agrees for a period of twelve (12) months from the date hereof, unless terminated as of an earlier date pursuant to the terms hereof (the "Exclusivity Period"), to initiate discussions on behalf of the Company on an exclusive basis with interested parties with respect to their potential interest in effectuating a Transaction. The Exclusivity Period may be extended by mutual consent of the Company and Waller. Notwithstanding anything in this document, the Exclusivity Period shall automatically extend beyond the initial twelve month period specified above as long as the Company is engaged in active negotiations with respect to a Transaction with a third party or parties and so long as the Company has not terminated this letter as a result of any conduct by Waller that constitutes bad faith or gross negligence.

3. <u>Fees</u>. If the Company consummates, directly or indirectly, a Transaction prior to the expiration of the Exclusivity Period, the Company shall pay to Waller in consideration of the services rendered by Waller hereunder, a fee ("Transaction Fee") equal to:

    (a)    1.0% of the first $250 million of Total Value (defined below), *plus*

    (b)    2.0% of the next $50 million of Total Value , *plus*

    (c)    3.0% of any Total Value in excess of $300 million.

It is the intention of the parties that the Transaction Fee will be computed based upon the aggregate value involved in a Transaction regardless of how allocated or the form of consideration, without duplication. Therefore, for purposes of this letter agreement, the term "Total Value" shall include (but not by way of limitation and without duplication) the total consideration paid to the Company or its investors (including amounts received by holders of options, warrants and convertible securities and the value of any dividends or other distributions paid to securityholders outside the ordinary course of business), including the principal amount of all short-term and long-term indebtedness (other than intercompany indebtedness) which is forgiven, retired or paid in connection with any Transaction. The Total Value shall also include (i) any and all deferred installments of sale or purchase price, (ii) any portion of the Total Value held in escrow subsequent to closing, and (iii) payments to be made in the future upon the occurrence of certain contingencies or consideration to be paid such as payments for non-competition agreements. The portion of the Transaction Fee relating to such deferred installments, escrow amounts or contingent payments or other consideration will be calculated and payable if and when such deferred installments, escrow amounts or contingent payments or other consideration are made and without regard to whether the engagement hereunder has been terminated or completed. If any portion of the Total Value is paid in the form of securities that have an existing public trading market, the value of such securities, for purposes of calculating the Transaction Fee, shall be determined by the average of the last sales prices for such securities on the five trading days ending five days prior to the consummation of the Transaction or future date upon which the entitlement thereto arises, as the case may be. If any portion of the Total Value is paid in the form of securities that do not have an existing public trading market or other property, the value of such securities or other property, for purposes of calculating the Transaction Fee, shall be the fair market value thereof, as determined in good faith by Waller, on the day prior to the consummation of the Transaction or future date upon which the entitlement thereto arises, as the case may be.

4. <u>Expenses</u>. In addition to any fees that may be payable to Waller hereunder and regardless of whether any Transaction is proposed or consummated, the Company hereby agrees, from time to time upon request, to reimburse Waller for its reasonable out-of-pocket costs and

2

expenses arising after the date hereof in connection with Waller's services hereunder, including, without limitation, all reasonable travel, entertainment, data, long-distance telephone and facsimile transmission charges, duplicating and printing charges, plus any sales, use, value added, stamp, withholding or similar taxes. Notwithstanding the foregoing, Waller shall consult with the Company prior to incurring expenses in excess of $10,000 in the aggregate, and for each $5,000 of expenses incurred thereafter. The reasonable fees and disbursements of legal counsel and any other outside professionals retained by Waller in connection with providing its services under this letter with the prior written consent of the Company shall be reimbursed by the Company.

5.   Non-Disclosure.   Any written or oral opinion or advice provided by Waller in connection with its engagement hereunder shall be treated by the Company as confidential and is exclusively for the information of the Company, the Company's Board of Directors, the Company's officers, directors, partners, shareholders, employees, accountants, attorneys, agents, consultants, advisors, financing sources and financial institutions. No such opinion or advice, and no reference to Waller's engagement hereunder or its involvement in the Transaction, may be disclosed to any third party or circulated or referred to publicly without Waller's prior written consent.

6.   Coordination.   In order to most effectively coordinate our efforts to effect the Transaction in a satisfactory manner to the Company, the Company and its senior executives shall cooperate fully with Waller, make available to Waller all information concerning PR Cable and the Transaction that Waller reasonably requests and use all resources and personnel reasonably necessary to assist Waller in connection with Waller's engagement hereunder. The Company shall also provide Waller access to the Company's executive officers directors, independent accountants and legal counsel. The Company recognizes that, in providing our services pursuant to this letter agreement, Waller will rely upon and assume the accuracy and completeness of all of the financial, accounting and other information discussed with or reviewed by Waller for such purposes, and Waller does not assume responsibility for the accuracy of completeness thereof. Waller will have no obligation to conduct any independent evaluation or appraisal of the assets or liabilities of the Company or any other party or to advise or opine on any related solvency issues. Waller shall maintain the confidentiality of the information of the Company and shall not disclose such information to any third party without consultation with the Company.   Waller shall obtain the Company's prior consent to discuss or present the Transactions to any third party.

7.   Indemnification.   The Company hereby agrees to the provisions with respect to indemnification of Waller and the other matters set forth in Annex A hereto, which is hereby incorporated by reference into this letter agreement.

3

8. <u>Termination of Engagement</u>. Waller's services may be terminated by the Company or Waller at any time with or without cause. Such termination shall be effective immediately following the receipt of written notice to such effect. The Company agrees that, in the event Waller's engagement hereunder is terminated as contemplated by the previous sentences or in the event the Exclusivity Period expires, the Company shall pay to Waller the Transaction Fee in the event that at any time prior to the expiration of six (6) months after such termination the Company (i) completes the Transaction or a similar transaction involving the subject matter of the Transaction or (ii) enters into a definitive agreement relating to a similar transaction during such period (which subsequently closes) involving the subject matter of the Transaction, in each case, with third parties introduced by Waller to the Company or where Waller was involved. In such instance, the Transaction Fee shall be payable upon consummation of either the Transaction or such other transaction. Notwithstanding the foregoing, in the event the Company terminates this engagement a result of any conduct by Waller that constitutes bad faith or gross negligence, then the Company shall have no further obligation to pay Waller fees or expenses after the termination of this engagement. The obligations of the Company as set forth in this letter agreement (other than paragraphs 1 and 6), including Annex A hereto, shall survive any termination or completion of the engagement contemplated hereby.

9. <u>Governing Law; Jurisdiction and Waiver of Jury Trial</u>. **This letter agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to conflicts of law or choice of law principles. The Company hereby agrees that any suit or proceeding arising out of or relating to the engagement contemplated hereby shall be had in the Federal or state courts in the Borough of Manhattan in The City of New York, and hereby consents to jurisdiction and venue in such courts. Waller hereby agrees and the Company hereby agrees to waive any right to trial by jury with respect to any claim, counterclaim or action (whether based on contract, tort or otherwise) arising out of or relating to this letter agreement, Annex A, the Transaction or Waller's services rendered or being considered by Waller hereunder.**

10. <u>Entire Agreement, etc.</u> This letter agreement (including Annex A attached hereto) contains the entire understanding and agreement of the parties hereto and supersedes all prior agreements, understandings and negotiations between the parties hereto relating to the subject matter hereof. The invalidity or unenforceability of any of the provisions of this letter agreement shall not affect the validity or enforceability of any other provisions hereof, which shall remain in full force and effect. The benefits of this letter agreement shall inure to the parties hereto, their respective successors and assigns, and to the indemnified parties hereunder and their respective successors and assigns and representatives, and the obligations and liabilities assumed in this letter agreement by the parties hereto shall be binding upon their respective successors and assigns. This letter agreement may only be amended or modified by a writing signed by the parties hereto. Neither party shall have the right to assign this agreement without the prior written consent of the other party.

4

11. Miscellaneous.

(a)    The Company hereby acknowledges that Waller is acting as an independent contractor and not in any other capacity and any duties of Waller arising out if its engagement hereunder shall be owed solely to the Company, and nothing in this letter agreement shall be deemed to create a fiduciary or agency relationship between Waller and the Company or its stockholders. Except as set forth in Annex A hereto, nothing in this letter agreement is intended to confer upon any other person (including stockholders, employees or creditors of the Company) any rights or remedies hereunder or by reason hereof.

(b)    Waller does not provide accounting, tax or legal advice. Upon consummation of the Transaction or any portion thereof, with the prior written consent of the Company, Waller may, at its own expense, make announcements or advertisements (including, without limitation, in financial newspapers and journals) describing its services hereunder.

(c)    Unless otherwise expressly agreed and to the extent permitted by applicable law, no one other than the Company, its officers, directors and shareholders are authorized to make use of or rely upon the Company's engagement of Waller or any statements, advice, opinions or conduct by Waller, and the Company shall not directly or indirectly disseminate, distribute or otherwise make available any advice, services, or materials prepared by Waller without Waller's prior written consent, other than to the Company's officers, directors, partners, shareholders, employees, accountants, attorneys, agents, consultants, advisors, financing sources and financial institutions.

(d)    Without limiting the foregoing, any opinions or advice rendered to the Company's Board of Directors (or a committee thereof) or management in the course of the Company's engagement of Waller do not constitute a recommendation to any stockholder of the Company concerning action that such stockholder might or should take in connection with the Transaction.

(e)    In the event any suit or other legal proceeding is brought for the enforcement of any of the provisions of this letter agreement, the parties hereto agree that the prevailing party shall be entitled to recover, in addition to any other appropriate amounts, from the other party, upon final resolution of such matter on the merits, reasonable attorneys' fees and expenses, including, without limitation, attorneys' fees for any appeal, and costs incurred in bringing such suit or proceeding. Notwithstanding paragraph 4 hereof, Waller's selection and engagement of counsel under this paragraph 11(e) shall not be subject to the Company's consent.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

If the above conforms with your understanding, kindly confirm your acceptance and agreement by signing and returning the enclosed copy of this letter agreement to the undersigned, whereupon this letter agreement and each counterpart hereof will constitute a binding agreement between the Company and Waller.

Very truly yours,

WALLER CAPITAL PARTNERS, LLC

By: _____

John W. Waller III
Chairman

Accepted and agreed to as of the date
set forth above:

PUERTO RICO CABLE HOLDING COMPANY INC.

By: _____

Name: ERIC LIMBERG
Title: DIRECTOR

Attachment: Annex A

If the above conforms with your understanding, kindly confirm your acceptance and agreement by signing and returning the enclosed copy of this letter agreement to the undersigned, whereupon this letter agreement and each counterpart hereof will constitute a binding agreement between the Company and Waller.

Very truly yours,

WALLER CAPITAL PARTNERS, LLC

By: _____
      John W. Waller III
      Chairman

Accepted and agreed to as of the date
set forth above:

PUERTO RICO CABLE HOLDING COMPANY INC.

By: _____
      Name:
      Title:

Attachment:  Annex A

6

Puerto Rico Cable Holding Company Inc.
April 3, 2007

## Annex A

The Company shall indemnify and hold harmless Waller, its affiliates, the managers, officers and employees of Waller and its affiliates (collectively, "Indemnified Persons"), from and against, and the Company agrees that no Indemnified Person shall have any liability to the Company or its owners, parents, affiliates, securityholders or creditors for, any and all losses, claims, damages, judgments, assessments, costs, liabilities or expenses (including actions, claims, investigations or proceedings in respect thereof (collectively, "Actions") brought by or against any person, including stockholders, members or partners of the Company (as the case may be), and the cost of any investigation and preparation therefor and defense thereof) (collectively, "Losses") (A) arising out of or in connection with any statements or omissions (i) made in any disclosure or other information or materials used in connection with the Transaction or (ii) used in the advice, services, commitment or other obligations rendered or being considered by Waller (collectively, "Waller's Role") in the letter agreement of which this Annex A is a part (the "Letter Agreement"), or (B) otherwise arising out of or in connection with the Transaction or Waller's Role; provided, however, that this indemnity shall not apply to the Losses of an Indemnified Person that have resulted from the bad faith or gross negligence of such Indemnified Person.

In the event that the foregoing indemnification is for any reason not available or is insufficient to hold an Indemnified Person harmless (except by reason of the gross negligence or bad faith of an Indemnified Person), then the Company shall contribute to the Losses involved in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by the Company, any affiliate of the Company and any guarantor of the Company's obligations hereunder or in the Transactions and any of their securityholders, on the one hand, and by Waller, on the other hand, with respect to the Transactions to which such indemnification relates or would have related or, if such allocation is judicially determined by a court of competent jurisdiction in a final judgment not subject to appeal to be unavailable or if it is insufficient to hold an Indemnified Person harmless (except by reason of the gross negligence or bad faith of an Indemnified Person), in such proportion as is appropriate to reflect not only such relative benefits, but also other equitable considerations such as the relative fault of the Company or any such affiliate, guarantor or securityholder, on the one hand, and of Waller, on the other hand; provided, however, that in no event shall the Indemnified Persons as a whole be required to contribute an amount greater than the amount of all fees actually received by Waller from the Company in connection with Waller's Role as to such Transactions (except by reason of the gross negligence or bad faith of an Indemnified Person). The relative benefits to the Company, any such affiliate of the Company, any such guarantor and any of their securityholders, on the one hand, and Waller, on the other hand, with respect to the Transactions to which such indemnification relates or would have related shall be deemed to be in the same proportion as (a) the total gross proceeds (before costs and expenses) received, or the total value paid or proposed to be paid or received or proposed to be received, in each case by or on behalf of the Company, each such affiliate, each such guarantor and their securityholders, as the case may be, pursuant to such Transactions, whether or not consummated, bears to (b) all fees paid or to be paid to Waller by the Company in connection with Waller's Role as to such Transactions. The relative fault of the Company, any affiliate of the Company, any guarantor and any of their

securityholders, on the one hand, and Waller, on the other hand, with respect to the Transactions to which such indemnification relates or would have related shall be determined, in the case of Losses arising out of or based on any untrue statement or any alleged untrue statement of a material fact or omission or alleged omission to state a material fact, by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company, any affiliate of the Company, any guarantor and any of their securityholders to Waller and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such untrue statement or omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act of 1933, as amended) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation for Losses directly related to such fraudulent misrepresentation.

The Company shall reimburse each Indemnified Person for all expenses (including, without limitation, reasonable fees and disbursements of counsel) as they are incurred by such Indemnified Person in connection with investigating, preparing for or defending any Action, whether or not in connection with pending or threatened litigation in which any Indemnified Person is a party. The Company agrees that it will not settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened Action in respect of which indemnification may be sought hereunder (whether or not an Indemnified Person is a party therein) unless such settlement, compromise, consent or termination includes an unconditional release of each Indemnified Person from all liability arising therefrom. The Company will not permit any such settlement, compromise, consent or termination to include a statement as to, or an admission of, fault, culpability or a failure to act by or on behalf of an Indemnified Person, without such Indemnified Person's prior written consent. Notwithstanding paragraph 4 of the Letter Agreement, the Indemnified Persons' selection and engagement of counsel under this Annex A shall not be subject to the Company's consent.

The obligations of the Company hereunder shall inure to the benefit of any successors, assigns, heirs and representatives of any Indemnified Person.

Prior to entering into any agreement or arrangement with respect to, or effecting, any proposed sale, exchange, dividend or other distribution or liquidation of all or a significant portion of its assets (other than pursuant to a Transaction) or any significant recapitalization or reclassification of its outstanding securities in one or a series of transactions, the Company shall notify Waller in writing thereof (if not previously so notified) and, if requested by Waller, shall arrange alternative means of providing for the obligations of the Company set forth in this Annex A, including the assumption of such obligations by another party, insurance, surety bonds or the creation of an escrow, in each case in an amount and upon terms and conditions satisfactory to Waller, in its reasonable discretion.

The invalidity or unenforceability of any of the provisions of this Annex A shall not affect the validity or enforceability of any other provisions hereof, which shall remain in full force and effect.

8

Exhibit B



## Confidential Information Memorandum

**MAY 2007**

Waller Capital PARTNERS

HIGHLY CONFIDENTIAL

# Choice Cable TV

### MEMORANDUM NUMBER: _____

Waller Capital Partners, LLC ("Waller Capital") has been exclusively retained by Puerto Rico Cable Holding Company Inc. (d/b/a Choice Cable TV, "Choice") to explore strategic alternatives. Choice intends for this Confidential Information Memorandum to be distributed to a limited number of interested parties.

Waller Capital has prepared the following descriptive outline of Choice (the "Confidential Information Memorandum") from information furnished by Choice and other sources. This Confidential Information Memorandum is solely for informational purposes to assist sophisticated potential purchasers in making their own evaluation of Choice and does not purport to be complete, or to contain all of the information that a potential purchaser may require. In all cases, interested parties should conduct their own investigation and analysis of Choice and the data set forth in the Confidential Information Memorandum.

It is expected that any party interested in pursuing a transaction with Choice will conduct its own investigation and will, at the appropriate time, negotiate the terms of such a transaction with Choice. Representatives of Waller Capital will be available to answer questions concerning Choice and will, upon request, make available such information as the recipient might reasonably require.

Receipt and acceptance of the Confidential Information Memorandum shall constitute an agreement by the recipient that the information contained herein shall not be reproduced or used for any purpose other than in connection with consideration by the recipient of the potential transaction with Choice and that the information will not be transmitted to or discussed with any persons other than the authorized representatives, agents and advisors of the recipient without prior written consent of Choice.

All information contained or referred to in this Confidential Information Memorandum shall be deemed to be "Confidential Information" under, and be subject to, any confidentiality or non-disclosure agreement entered into between any interested party and/or its affiliates, advisors or clients, on the one hand, and Choice and/or its affiliates, on the other hand.

Statements made in this Confidential Information Memorandum that are not historical facts may constitute forward-looking statements that are subject to risks and uncertainties that could cause actual results to differ materially from those discussed. Forward-looking statements include the information concerning possible or assumed future results of the operation of Choice. In addition to information regarding Choice's anticipated revenue and expenses, forward-looking statements are also those preceded by, followed by or that include words such as "believes," "expects," "anticipates," "intend," "proposes," "plans," "estimates," "pro forma," or similar expressions.

Waller Capital assumes no liability for independent verification of the data contained in this Confidential Information Memorandum. Neither Choice nor Waller Capital (nor any of their affiliates, directors, officers, members or employees) makes any representation or warranty as to the accuracy or completeness of the information contained in this Confidential Information Memorandum or any other written or oral statement provided and only such information as may eventually be included in definitive agreements relating to the proposed transaction shall have any legal effect.

HIGHLY CONFIDENTIAL

*All communications or inquiries relating to Choice should be directed to Waller Capital. No personnel of Choice should be contacted under any circumstances. Please direct all inquiries to the following Waller Capital bankers.*

**WALLER CAPITAL PARTNERS, LLC**
**30 ROCKEFELLER PLAZA**
**SUITE 4350**
**NEW YORK, NEW YORK 10112**
**TELEPHONE : (212) 632-3600**

---

**JOHN W. WALLER, III**
Chairman
jwaller@wallercc.com
tel: (212) 632-3600
fax: (212) 632-3607

**GARRETT M. BAKER**
Partner, Managing Director
gbaker@wallercc.com
tel: (212) 632-3600
fax: (212) 632-3607

**JEFFREY A. BRANDON**
Director
jbrandon@wallercc.com
tel: (212) 632-3616
fax: (212) 402-1795

**CHRISTOPHER N. ERWIN**
Analyst
cerwin@wallercc.com
tel: (212) 632-3627
fax: (212) 402-1771

---

HIGHLY CONFIDENTIAL

# Table of Contents

EXECUTIVE SUMMARY ............................................................................................. 3

INVESTMENT HIGHLIGHTS..................................................................................... 11

COMPANY OVERVIEW .............................................................................................. 19

OPERATING MARKETS............................................................................................. 26

FINANCIAL INFORMATION ..................................................................................... 33

APPENDIX ................................................................................................................... 38

Walker Capital

HIGHLY CONFIDENTIAL

# Executive Summary

HIGHLY CONFIDENTIAL

# EXECUTIVE SUMMARY

## INTRODUCTION

Puerto Rico Cable Holding Company Inc. (d/b/a Choice Cable TV, "Choice" or the "Company") provides broadband services including all-digital television ("Video") and high-speed Internet access ("HSD") to residential customers in the southern and western coastal region of Puerto Rico. Choice serves its subscribers with an advanced, all-digital, fiber-rich network from a single headend. Choice is the sole cable operator in all of the communities it serves. As of December 31, 2006, Choice's network passed 328,821 homes and served 74,617 basic Video subscribers and 86,444 unique customers.

Under the leadership of the current management team, Choice has made substantial improvements to its network, products and operations. Choice recently interconnected all of its communities with a robust 190 mile fiber backbone, underwent a comprehensive plant audit, expanded its footprint by 21,756 homes passed and strengthened the network with added nodes and stand-by power supplies. Additionally, Choice has successfully converted 100% of its Video subscribers to all-digital packages and has become one of the only cable systems in the world to completely eliminate its analog signal. This strategic initiative has redefined the capabilities of a cable system and freed up the bandwidth required to offer a cutting edge suite of advanced services. On the strength of these network improvements, Choice initiated a system-wide Video-on-Demand ("VOD") launch in April 2007 and is currently beta testing telephone ("Voice") services for a planned system-wide launch in 2008.

Choice has achieved industry leading HSD growth, increasing its subscriber base by 84.3% in 2005 and 88.2% in 2006. Choice has also consistently grown its Video subscriber base over the same period. These strong results have been largely driven by a highly effective direct sales force of over 175 representatives trained in the Company's proprietary direct sales program.

### CHOICE CABLE TV SUBSCRIBER TRENDS



These accomplishments have positioned Choice for extraordinary future growth. As of December 31, 2006, basic Video penetration and HSD penetration were only 22.7% and 8.4%, respectively, far below industry norms. These low penetration rates highlight the significant headroom for growth. Choice expects the broad roll-out of advanced services to accelerate customer gains and improve retention. Furthermore, Choice is also well positioned to develop a substantial enterprise services business, an area that has not been focused on to date. Choice's significant network investments will support ongoing additions to its service offerings, ensuring that Choice will continue to deliver the most compelling value proposition in its market for the foreseeable future.

Waller Capital

HIGHLY CONFIDENTIAL

## FINANCIAL SUMMARY

Choice has dramatically improved its financial performance under the leadership of the current management team. The current team oversaw the 2004 separation of the Company from its prior owner, Centennial Communications Corp. ("Centennial"), as well as the operational improvements described above. Management also created stand-alone financial, administrative, marketing and information systems. Over the past two years management has demonstrated its ability to deliver strong financial results, generating double-digit annual EBITDA growth and improving EBITDA margins by over 11 percentage points.

### CHOICE CABLE TV FINANCIAL PERFORMANCE HIGHLIGHTS



| (FYE Dec, $mm) | 2004 | 2005 | 2006 | 2007E |
|---|---|---|---|---|
| Revenue | 51.2 | 53.7 | 55.6 | 63.3 |
| *% growth* | | *4.9%* | *3.6%* | *13.9%* |
| | | | | |
| EBITDA | 12.6 | 18.4 | 19.8 | 23.1 |
| *% growth* | | *46.1%* | *7.9%* | *16.5%* |
| *% margin* | *24.6%* | *34.2%* | *35.7%* | *36.6%* |
| | | | | |
| CAPEX | | | | |
| Growth | 4.6 | 5.9 | 11.1 | 7.6 |
| Maintenance | - | 1.9 | 4.5 | 2.7 |
| Total | 4.6 | 7.8 | 15.6 | 10.2 |
| | | | | |
| ARPU | | 61.04 | 62.60 | 70.31 |
| | | | | |
| Operating Summary (EOP) | | | | |
| Homes Passed | 307,065 | 316,852 | 328,821 | 328,896 |
| | | | | |
| Video (all-Digital) Subscribers | 73,150 | 73,458 | 74,617 | 75,532 |
| *% of Homes Passed* | *23.8%* | *23.2%* | *22.7%* | *23.0%* |
| *% growth* | | *0.4%* | *1.6%* | *1.2%* |
| | | | | |
| HSO Subscribers | 8,007 | 14,756 | 27,777 | 48,796 |
| *% of Homes Passed* | *2.6%* | *4.7%* | *8.4%* | *14.8%* |
| *% of Basic/Digital Subs* | *10.9%* | *20.1%* | *37.2%* | *64.6%* |
| *% growth* | | *84.3%* | *88.2%* | *75.7%* |
| | | | | |
| Unique Customers | 74,352 | 76,732 | 86,444 | 102,600 |

Walker Capital

HIGHLY CONFIDENTIAL

## MARKETS

Choice serves vibrant, densely populated communities, including three of Puerto Rico's five largest cities outside of the San Juan metro area (Ponce (186k), Mayaguez (100k) and Aguadilla (66k)). Choice's market is a nearly contiguous string of small cities and large towns that runs along the coast from Isabela in the northwest to Patillas in the southeast.

Choice's market enjoys diverse economies with notable strength in pharma/biotech, electronics, petrochemicals, shipping and transportation and tourism. Choice's market also includes a large number of small-to-medium enterprises which are a largely untapped business opportunity for Choice.

The region is undergoing significant economic expansion which is being driven by industrial development and the construction of new transportation infrastructure. Recent expansion and improvements to a network of highways linking San Juan, Ponce, Mayaguez and Aguadilla (including Highways PR-52 and PR-2) are bringing a significant influx of affluent San Juan area commuters to the region, which is spurring a number of new residential developments along Choice's network. The region is also benefiting from expansion of the Port of Ponce into the nation's second super port, which is attracting numerous businesses to the area. These infrastructure improvements are also attracting substantial cruise ship traffic to the area and are expected to make Ponce a major Caribbean cruise ship hub.

### PUERTO RICO



## NETWORK SUMMARY

Choice has made substantial network investments in recent years and now operates an advanced, all-digital, fiber-rich network served by a single headend. In 2006, Choice interconnected all of its communities with a robust 190 mile fiber backbone. The 142 mile core of the backbone (Aguadilla to Santa Isabel) generally has 144 individual fibers (minimum of 48). The 48 mile edge of the backbone (Aguadilla to Quebradillas; Santa Isabel to Maunabo) generally has 48 to 60 individual fibers (minimum of 12). The high fiber count gives Choice substantial reserve capacity for future residential services as well as new enterprise services. There are no fiber routes in Choice's service area that are as robust or comprehensive.

In December 2006, Choice completed its digital conversion and today 100% of Choice's Video customers are on all-digital packages. This transition allowed Choice to become one of the only cable systems in the world to completely eliminate its analog Video signal, freeing up substantial bandwidth for the launch of advanced services and redefining the capabilities of a cable system.

Choice's 450 MHz all-digital network offers the same Video programming and suite of advanced services (VOD, High Definition TV, HSD, Voice) typically delivered by a traditional analog/digital 750 MHz system. This is possible because Choice eliminated 100% of its analog Video signal. Traditional analog/digital plant generally carries approximately 78 analog video channels, which at 6 MHz per channel occupy approximately 468 MHz of total bandwidth. By contrast, Choice compresses these same channels (6:1 ratio) so they only occupy 78 MHz of total bandwidth. In addition to being more efficient, Choice's all-digital Video offers consumers superior picture quality and has virtually eliminated signal theft, as consumers require a secure set-top box to decode the signal.

Walter Capital

HIGHLY CONFIDENTIAL

### CHOICE'S ALL-DIGITAL NETWORK SUPPORTS ALL OF THE ADVANCED SERVICES AVAILABLE ON A TRADITIONAL 750 MHz ANALOG/DIGITAL PLANT



|  | Choice 100% Digital Plant | Traditional 750 MHz Analog/Digital Plant |
|---|---|---|
| Total Plant Capacity | 450 MHz | 750 MHz |
| Less: Unusable Capacity | (48 MHz) | (54 MHz) |
| Usable Bandwidth | 402 MHz | 696 MHz |
| Total Analog Channels | - | 78 |
| MHz/Analog Channels | na | 6 MHz |
| Bandwidth Used by Analog Video | (-) | (468 MHz) |
| Total Digital Video Chanels & Other Basic Digital Services | 240 | Same services as Choice |
| MHz/Digital Video Channel [1] | 1 | 0.6 |
| Bandwidth Used by Digital Services | (205 MHz) | (159 MHz) |
| Bandwidth Available for Advanced Services | 197 MHz | 69 MHz |
| Less: Current Advanced Services (HSD, Voice, VOD, HD/DVR) | (98 MHz) | (66 MHz) |
| Reserve Capacity for Future | 99 MHz | 3 MHz |

On the strength of these recent network improvements, Choice initiated a system-wide VOD launch in April 2007 and Choice is currently beta testing Voice services system-wide and will launch Voice commercially in 2008. Choice's VOD product offers approximately 600 recent movie titles per month, as well as several hundred hours of additional programming including Discovery On Demand, new movie release "extras", Kids Unlimited On Demand, Karaoke and Music On Demand and Event "extras". Choice plans to add additional VOD content, such as HBO On Demand, as demand for VOD service grows. Choice can add

---

[1] Figures are for "typical" video channels. Digital music channels and other digital services have different requirements.

HIGHLY CONFIDENTIAL

additional VOD programming for relatively immaterial incremental capital investment. Choice is conducting a Voice beta-test that will cover multiple homes in each of the 31 municipalities that it serves.

## ADVANCED SERVICES

The recent and pending network investments described above have created a tremendous opportunity to grow high margin advanced services such as HSD, VOD and Voice. As a result of these investments, Choice's advanced service products are superior in both quality and price relative to its competitors' offerings.

With the marketing slogan "Twice the Speed for $1 Less", Choice's HSD product is attractively positioned in the marketplace as the fastest and the most affordable. Choice's entry level HSD offering of 512 Kbps for $23.95 compares very favorably to the local ILEC's (Puerto Rico Telephone Company or "PRTC") DSL offering of 256 Kbps for $24.95. Furthermore, PRTC's network is incapable of offering DSL in much of Choice's service area, creating areas in which Choice is the only HSD service.

These dynamics have created a robust growth opportunity for Choice's HSD product. Over the past two years, Choice grew HSD subscribers from 8,007 to 27,777, and budgets HSD subscribers to grow to 48,796 by the end of 2007. During the first quarter of 2007, Choice averaged over 2,000 net HSD subscriber "adds" per month, and expects this trend to continue well into the future. Choice has also had tremendous success marketing HSD service to non-Video customers, which now represent over half of Choice's total HSD subscribers. Choice believes that these HSD-only customers are the beachhead for its planned "triple-play" campaign to win back Video customers.

Choice has extremely high expectations for its newly launched VOD offering. Historically, Choice has had great success with pay-per-view ("PPV") products, with buy rates far in excess of industry norms. For example, in 2004 Choice averaged PPV buy-rates of approximately 16.6% (monthly buy rate percentage of average Video subscribers). Choice also believes that the other Puerto Rico cable operators have had outstanding success with their VOD offerings. Choice believes that the popularity of PPV and VOD in Puerto Rico is due to its value conscious, family oriented culture seeking affordable at-home entertainment. As the cable industry has shifted from PPV towards VOD, the quantity and quality of PPV content available to Choice has steadily declined over time (32 channels in 2004 to 4 channels today). Choice's new VOD offering is addressing an area of strong demand in the Puerto Rico market.

Choice plans to launch its Voice service in 2008 and expects its Voice offering to generate consumer demand comparable to that of its HSD offering due to its ability to deliver quality service and value far superior to its competition. Choice plans to offer a basic "all-island" package for $24.95 per month and an unlimited "all-island and mainland U.S." package for $45.95 per month. By comparison, PRTC's legacy system, which is well known for its poor service and frequent service disruptions, offers a very limited basic service (five community radius) for $29.99 a month and an "all-island" (no mainland U.S.) service for $49.99 per month. Management believes that the other Puerto Rico cable operators have had outstanding success with their Voice products.

Choice believes that its superior HSD and Video, combined with Voice for a "triple-play" offering, will make it the best consumer value in its markets by a wide margin. By contrast, PRTC's ability to upgrade its offerings is sharply limited by its inferior legacy network. Additionally, Choice's all-digital, fiber-rich network has abundant capacity for new and improved advanced services well into the foreseeable future.

### SERVICE LAUNCH TIMELINE



Waller Capital

HIGHLY CONFIDENTIAL

## UNIQUE CUSTOMER GROWTH OPPORTUNITY

Choice is enjoying exceptional customer growth and is positioned to grow unique customers well into the future at rates far above industry norms. Choice grew unique customers from approximately 74,352 (66,345 Video, 1,202 HSD and 6,805 HSD & Video) at the end of 2004 to 86,444 (58,667 Video, 11,827 HSD and 15,950 HSD & Video) as of December 31, 2006 (7.8% CAGR) and Choice budgets 102,600 unique customers by December 2007, up 18.7% from 2006. Choice forecasts 164,000 unique customers by December 2011 (12.4% CAGR from 2007).

**Unique Customers (000s)**



Choice's historic customer growth is attributable to the network and service improvements described above, as well as the exceptional sales and marketing team that it has built over the past three years.

Choice expanded its network footprint substantially in recent years. Choice increased homes passed from 307,065 at December 31, 2004 to 328,821 at the end of 2006 (11,969 passings added in 2006 alone), and has only recently begun aggressively selling into these areas. Choice has identified additional compelling new build opportunities that represent 25,000 homes. Choice is confident that it will continue to enjoy similar new build opportunities at the rate of 7,500 to 10,000 homes per year well into the future.

To address this market opportunity, Choice has developed a highly effective sales and marketing effort which includes the aggressive use of direct sales representatives, a highly trained professional local call center, innovative Kiosks located in high traffic local malls and targeted direct mail, radio, newspaper and television advertising. The Company has a well developed, proprietary recruiting and training model for its direct sales force which has significantly increased sales. This sales effort averaged 1,120 net new unique customers per month between March 2006 and March 2007.

The Company also expects its ongoing rollout of product improvements and advanced services to dramatically reduce churn. In addition to the new "all-digital Video" product and VOD launch, Choice added 12 new Spanish language/local Puerto Rico broadcast channels to its line-up since August of 2005 (6 in the last four months), giving Choice a superior line-up of 44 Spanish language/local Puerto Rico channels compared to direct broadcast satellite video services or "DBS" (DirecTV and Echostar), which Management estimates to be in the low 30s. These improvements have enabled Choice to position its Video product as superior (picture quality, channel line-up, On Demand features) to DBS for the first time in its history. Choice has an ongoing strategy of regularly increasing the speed of its entry offerings to strengthen their position in the marketplace. The addition of Voice services in 2008 will allow Choice to market highly "sticky" "triple-play" bundles which will offer consumers superior service and value to competing offerings. Choice believes that Puerto Rico consumers are especially sensitive to value.

Despite its recent growth, Choice's HSD and Video penetration rates are only 8.4% and 22.7% of homes passed, respectively (as of December 31, 2006) leaving substantial headroom for further growth. This low penetration is the legacy of an ill-fated 2002 effort by Choice's prior owner to require all video subscribers to

Waller Capital

HIGHLY CONFIDENTIAL

immediately convert to digital set-top boxes. This effort was accompanied by technical, operational and customer service problems which caused the Company to lose ~25% of its basic subscribers from a peak of ~95,790 basic subscribers (December 2001). These former Choice Video subscribers have a basic familiarity with Choice and its services, making them more likely to buy Choice services in the future.

## COMPETITION

Choice has an extremely strong competitive position as a result of the recent network upgrades and product improvements described above. Choice is the only cable operator in its markets. It faces no land-line video competition, there are no cable overbuilders, and the incumbent local exchange carrier (PRTC) does not offer any video product and, given the state of its network, it is unlikely to offer Video for the foreseeable future.

Choice's only video competition is DBS. While the DBS providers have historically offered consumers a compelling video alternative to Choice, the recent network upgrades and product improvements described above have made Choice's Video offering superior for the first time in its history. Choice's all-digital service delivers superior picture quality. By contrast, DBS picture quality suffers from Puerto Rico's tropical climate (rain fade) and low latitude (signal must pass through more atmosphere). The DBS operators' one-way "broadcast" technology is also incapable at this time of matching Choice's newly launched VOD service which is particularly important in the Puerto Rico marketplace. Further, Choice's locally addressable network is better suited to delivering Spanish language and local content than DBS broadcast satellite technology.

Choice's only meaningful Internet access competitor is PRTC.[2] As described above, PRTC's legacy network is only able to offer DSL to a portion of Choice's service area. Moreover, PRTC's DSL product is sold at higher price points for slower speeds. Given the state of PRTC's network, Choice expects to be able to maintain a wide margin of superiority in its HSD product for the foreseeable future.

Choice expects its Voice product will also be superior in quality and price to the PRTC's offering. Choice is confident that its Voice product will be a compelling alternative to the PRTC's offering and will generate significant customer demand in the marketplace.

Choice also believes that it enjoys a competitive advantage in delivering customer service. Choice maintains local call centers and service representatives, while DBS providers use call centers domiciled on the mainland U.S. or in other countries and markets its product through independent local contractors. Local service is especially important in Puerto Rico given the island's specific culture and language.

## OWNERSHIP

Choice is controlled by HM Capital Partners, LLC ("HM"), a leading private investment firm that specializes in equity investments in communications and media companies and other industries. HM purchased Choice from Centennial in December, 2004. Choice is incorporated under the laws of the Commonwealth of Puerto Rico.

---

[2] Choice also competes with Islanet, a small local wireless Internet access provider. Islanet offers service in Mayaguez only and Choice estimates that it serves less than 2,000 subscribers.

HIGHLY CONFIDENTIAL

# Investment Highlights

Walter Capital

HIGHLY CONFIDENTIAL

# INVESTMENT HIGHLIGHTS

## SUBSCRIBER GROWTH POTENTIAL

**Large Addressable Market**
- Low basic penetration (23%) = headroom for growth
- Recent ~22k homes passed footprint expansion
- Ongoing supply of attractive new build opportunities

**Highly Effective Sales Model**
- Highly effective direct sales force of 175 well trained professionals
- Averaged 1,120 net unique customer installs per month for LTM March 2007
- Gross video sales up 84% since 2004

**Untapped Commercial Business**
- Numerous small and medium enterprises passed by Choice's network
- Unexploited robust fiber backbone
- Negligible efforts to sell commercial HSD or bulk Video to date

**Improved Customer Retention Opportunity**
- Recently implemented retention efforts in place
- VOD and Voice have proven to significantly improve customer retention
- Modest improvement in churn yields significant net subscriber growth

## ADVANCED SERVICES OPPORTUNITY

**100% Digital Network with Excess Capacity**
- More than sufficient bandwidth for full suite of advanced services
- Plant already supporting HSD, High Definition TV, VOD with ongoing live Voice beta test across entire franchise area

**Industry Leading HSD Growth Rates**
- Rapidly growing HSD (88.2% in 2006) with substantial upside (only 8.4% penetration)
- Continued opportunity to sell HSD to Video and non-Video homes

**Recently Launched VOD**
- VOD rolled-out system-wide in April 2007
- Important point of differentiation from DBS

**Significant Voice Opportunity**
- System-wide roll-out in 2008
- Voice product has been highly successful in other PR service areas

## ATTRACTIVE PUERTO RICO MARKET

**Growing Communities**
- Stable, U.S.$-based economy and U.S. style consumer culture more like mainland U.S. than Caribbean / Latin America
- Positive local, economic drivers

**Limited Competition**
- No overbuilder presence in market
- No telco video strategies in market
- DBS signal inferior to mainland due to latitude and tropical weather

**Consolidation Opportunities**
- One of the largest, independently-owned cable systems remaining in U.S.
- Attractive Puerto Rico market is ripe for consolidation
- Huge synergy potential

Waller Capital

HIGHLY CONFIDENTIAL

## SUBSCRIBER GROWTH POTENTIAL

There is substantial opportunity to grow Choice's revenue and cash flow by growing basic and advanced services and exploiting the natural enterprise services opportunity in Choice's market. Choice's all-digital network and recent network expansion will accommodate rapid growth well into the future.

Choice is already enjoying exceptional unique customer growth and is positioned to continue growing unique customers well into the future at rates far above industry norms. Choice averaged 1,120 net new unique customers per month between March 2006 and March 2007, and budgets 102,600 unique customers by December 2007, up 18.7% from 2006. Choice forecasts reaching 164,000 unique customers by December 2011 (13.7% CAGR from 2006).

### Large Addressable Market

*Substantial Headroom for Growth:* Despite its recent growth, Choice's HSD and Video penetration were only 8.4% and 22.7% of homes passed, respectively (as of December 31, 2006) leaving substantial headroom for further growth. This low penetration is the legacy of an ill-fated 2002 effort by Choice's prior owner to require all video subscribers to immediately convert to digital boxes. This effort was accompanied by technical, operational and customer service problems which caused the Company to lose approximately 25% of its basic subscribers from a peak of ~95,790 basic subscribers (December 2001).

*Attractive Plant Extensions:* Choice also expanded its network footprint substantially in recent years. Choice increased homes passed from 307,065 at December 31, 2004 to 328,821 at the end of 2006 (11,969 passings added in 2006 alone). Recent and pending improvements to the highway linking Choice's service area to San Juan are attracting an influx of affluent San Juan commuters which is driving the growth of new residential developments along Choice's traditional service route. The economics of these new build opportunities are extremely attractive. For example, Choice built-out 21,756 new homes passed in 2005 and 2006 at an average cost of $193 per home. Management has identified projects with similar economics representing 25,000 homes and is confident that this trend will continue to create compelling plant extension opportunities at the rate of 7,500 to 10,000 homes per year, as communities such as Guayama, Coamo, suburban Ponce, Cabo Rojo & Mayaguez continue to experience rapid housing development.

### Highly Effective Sales Model

Choice has built a highly effective sales and marketing model over the past three years. Choice's sales and marketing effort includes the aggressive use of direct sales representatives ("DSRs"), a highly trained professional local call center, innovative Kiosks located in high traffic malls, targeted direct mail and television, radio and newspaper advertising.

Choice's direct sales force of more than 175 highly motivated DSRs go through the Company's proprietary direct sales training program which has yielded tremendous results. Over the course of the first quarter of 2007, Choice's DSRs generated approximately 2,300 Video sales per month and 1,580 HSD sales per month at an average cost of $34 and $14 per sale, respectively. Customers added through this direct sales effort have retention rates equal to or better than the Company average due to the detailed explanation of service, cost and billing that takes place during the sale. The DSRs have also been effective in selling HSD service to non-Video customers (often DBS customers), which now represent over half of the total HSD customer base. Choice believes that these DBS/HSD customers are the beachhead for its planned "triple-play" campaign to win back Video customers, especially as these subscribers roll off DBS contracts.

Choice also has a highly effective call center. Choice's call center is a modern facility that seats 41 professional customer service representatives ("CSRs"). Choice thoroughly trains each CSR upon hiring and throughout their career with the Company. CSRs receive merit based bonuses for beating various performance hurdles (sales, customer retention, abandoned phone calls, etc.). Choice's CSRs also produce dramatic results. For example, Choice's CSRs averaged 900 Video sales per month and over 1,700 HSD sales per month during the first quarter of 2007, or 68 sales per CSR seat per month at an average cost of less than $3.50 per sale.

Walker Capital

HIGHLY CONFIDENTIAL

Choice also operates five conveniently located cable stores in the cities of Aguadilla, Mayaguez, San German, Ponce and Guayama. Total CSR staffing of all stores is approximately 30. The stores are designed to handle all walk-in customer traffic including customer payment (in-person bill paying is very common in Puerto Rico), new sales, upgrades, voluntary disconnects, general inquiries and service problems. During the first quarter of 2007 the stores produced an average of 324 Video sales and 459 HSD sales per month at a cost of less than $9 per sale.

Choice has also recently deployed three innovative retail Kiosks to area malls. Located in high traffic areas, these colorful and interactive Kiosks are equipped with plasma televisions broadcasting the High Definition programming available on Choice's network. Two of these Kiosks operate rent free in exchange for limited amounts of television advertising insertions. The Kiosks handle all aspects of Choice's services, similar to the cable stores, but are more focused on selling Choice services. During the first quarter of 2007 the Kiosks produced an average of 248 Video sales and 497 HSD sales per month at a cost of less than $4 per sale.

These new sales efforts are driving extraordinary results. Over the first quarter of 2007, Choice generated 10,558 gross Video installs (42,232 annual run rate) and 11,253 gross HSD installs (45,012 annual run rate).

## Improved Customer Retention Opportunity

Since separating from Centennial in December 2004, Choice has been primarily focused on creating standalone systems (financial, administrative, marketing, MIS) and upgrading the network (new fiber backbone, comprehensive system audit, digital conversion). With these efforts now complete, Choice has recently been able to focus on growth-oriented initiatives, such as upgrading its service offerings (VOD, Voice, faster HSD) and improving its overall marketing strategy and customer service efforts. In recent periods, Choice has experienced churn in excess of historical norms. Accordingly, much of these new growth efforts are focused on improving customer retention.

_Improved Customer Service:_ Choice has recently established a number of programs aimed at reducing customer churn, including improved communications with late-paying customers, post installation phone calls, phone blasts reminding customers of scheduled service call appointments, telemarketing calls to customers promoting special offers and retention offers to customers that want to disconnect services due to financial problems or service difficulties. Furthermore, Choice has implemented its "first contact resolution" program where all Choice employees are committed to resolving any customer issue on the first visit to the customer's home. Finally, preventative maintenance of the network has been increased to help reduce customer problems. Although many of these programs are newly implemented they are already showing results in reducing churn.

_Faster HSD Speeds:_ Over the past two years, Choice has increased the speed of its basic level HSD product from 128 Kbps to 512 Kbps. In fact, Choice doubled its HSD speed for nearly all customers in the last six months. This has enabled Choice to distance itself from its competition and offer increased value to its customers. Choice's abundant reserve network capacity will support ongoing HSD improvements for years to come. Choice is committed to increasing its HSD speeds 25% - 100% annually in conjunction with annual price increases.

_VOD and Voice Launch:_ Choice launched VOD system-wide in April 2007. Choice has also recently readied its network for Voice and plans to launch Voice services in 2008. The introduction of VOD has made Choice's Video product superior to DBS and the launch of Voice will allow the Company to market "sticky", high-value "triple-play" bundles.

## Untapped Commercial Business

Choice also has a large, untapped opportunity to serve enterprise customers in its markets. Choice's service area is densely populated and contains a mix of residential and commercial developments in close proximity to one another. Accordingly, Choice's network passes numerous commercial sites, such as shopping malls, retail centers and office buildings. To date, Choice's efforts to sell bulk Video and commercial HSD services have also been extremely limited. These businesses could be served with minimal incremental resources. Choice's

Waller Capital

HIGHLY CONFIDENTIAL

planned roll-out of Voice services in July 2008 will be an important catalyst for growth of its enterprise business. With the addition of Voice, Choice will be able to offer commercial customers one stop shopping (Voice + HSD) and the most compelling package of value.

Choice's competition for enterprise customers is limited. Choice's only material competition is the historically state-run PRTC which operates an inferior legacy network. Centennial has limited presence in Choice's service area and actually depends on Choice's fiber backbone for data transport. The only other island telco, WorldNet Solutions (WorldNet), does not operate in Choice's service area but is a likely future user of Choice's fiber backbone. Given Choice's robust new fiber backbone, it is unlikely that Choice will face new competition in the future.

## ADVANCED SERVICES OPPORTUNITY

### 100% Digital Network with Excess Capacity

Choice's all-digital network has more than sufficient bandwidth to support a full suite of advanced services, including HSD, High Definition TV, VOD and Voice. A traditional analog/digital plant generally carries approximately 78 analog video channels. Choice compresses these same 78 channels (6:1 ratio), freeing up approximately 390 MHz for advanced services. In addition to being more efficient, Choice's all-digital Video offers consumers superior picture quality and has virtually eliminated signal theft, as consumers require a secure set-top box to decode the signal (see page six for illustration).

### New HSD, VOD and Voice Services

The recent and pending network investments described above have created a tremendous opportunity to grow high margin advanced services such as HSD, Voice, and VOD. These new advanced services will allow Choice to offer high value bundles which will also help drive basic subscribers by improving sell-though and reducing churn.



_Industry Leading HSD Growth:_ Choice has demonstrated tremendous growth in its HSD business, achieving industry leading growth rates. Choice grew HSD subscribers 64.3% in 2005 and 68.2% in 2006. This growth has been driven by the strong competitive positioning of its product in the marketplace in terms of both speed and value. Choice's HSD marketing slogan of "Twice the Speed for $1 Less" conveys the indisputable advantages of Choice's product versus the PRTC's. For example, Choice's most basic HSD offering is 512 Kbps for $23.95, while the local ILEC (PRTC) offers DSL with 256 Kbps for $24.95. Choice's top-of-the-line HSD product is 2.75Mbps for $76.95 compared to PRTC's top of the line 2.0Mbps for $84.95. Further, PRTC's sub-standard legacy network is incapable of offering DSL in much of Choice's service area. As a result, Choice budgets HSD subscribers to grow an additional 75.7% over the course of 2007 to 48,796. In fact, Choice averaged over 2,000 net HSD subscriber "adds" per month during the first quarter of 2007, and expects to grow monthly net "adds" well into the future.

_New Video on Demand Service:_ Choice has extremely high expectations for its newly launched VOD offering. Historically, Choice has experienced great success with PPV products, with buy-rates far in excess of industry norms. For example, in 2004 Choice averaged a PPV buy-rate of approximately 16.6% (buy-rate percentage of average Video subscribers). Choice also believes that the other Puerto Rico operators have had outstanding

HIGHLY CONFIDENTIAL

success with their VOD offerings. Choice believes that the popularity of PPV and VOD in Puerto Rico is due to its value conscious, family oriented culture. As the cable industry has shifted from PPV towards VOD, the quantity and quality of PPV content available to Choice has steadily declined over time (32 channels in 2004 to 4 channels today). Choice's new VOD offering will address an area of strong demand in the Puerto Rico market.

*Voice Service Launching 2008:* Choice plans to launch its Voice service in 2008 and expects its Voice offering to attract similar market demand as its HSD product has due to its ability to deliver higher quality, better service and better value to its customers. Choice plans to offer a basic "all-island" package for $24.95 per month and an unlimited "all-island and mainland U.S." package for $45.95 per month. By comparison, PRTC's legacy system, which is well known for its poor service and frequent service disruptions, offers a very limited basic service (five community radius) for $29.99 a month and an "all-island" (no mainland U.S.) service for $49.99 per month.

Choice believes that its superior HSD and Video, combined with Voice for a "triple-play" offering, will make it the best consumer value in its markets by a wide margin. By contrast, PRTC's ability to upgrade its offerings is sharply limited by its inferior legacy network. Additionally, Choice's all-digital, fiber-rich network has abundant capacity for new and improved advanced services well into the foreseeable future.

## ATTRACTIVE PUERTO RICO MARKET

### Growing Communities

Choice serves communities in the densely populated and fast-developing southern and western coastal region of Puerto Rico. Choice's market is a contiguous string of small cities and large towns that runs along the coast from Isabela in the northwest to Patillas in the southeast and include three of Puerto Rico's five largest cities outside of the San Juan metro area (Ponce (186k), Mayaguez (100k) and Aguadilla (66k)).

Choice's markets enjoy diverse economies with notable strength in pharma/biotech, electronics, petrochemicals, shipping and transportation and tourism. Notable employers in the region include Bristol-Myers, Eli Lilly, General Electric, Phasor Engineering, Dell and Chevron-Phillips. This region is undergoing significant economic expansion which is being driven in part by the construction of new transportation infrastructure. Highway PR-22, which connects San Juan and Arecibo is being extended to Choice's Aguadilla service area, and Highway PR-52, which connects San Juan to Choice's Ponce service area, is currently being renovated and expanded to support increased traffic along the central Puerto Rico route. These highway improvements are also bringing a significant influx of affluent San Juan commuters to the region which is spurring a number of new residential developments along Choice's network.



Waller Capital

HIGHLY CONFIDENTIAL

In addition, the Port of Ponce is currently being converted into a major international shipping hub. The "Port of the Americas", when completed, will be capable of servicing vessels with a controlling depth of 50 feet and handling up to 1.5 million TEU's (twenty-equivalent-units) per year. The Port of the Americas will also provide logistical support under the protection of a Foreign Trade Zone environment. Raw material, components and packaging can be transported tax free through these zones and items shipped abroad after processing are exempt from U.S. taxes. Total estimated investment in the Port of the Americas will be ~$750 million and it will bring ~12,000 jobs in the region.

The Puerto Rico government has recently created a number of initiatives to accelerate economic growth in Choice's area. For example, the Puerto Rico TechnoEconomic Corridor (PRTEC), a new "conglomerate of public and private entities united to facilitate and enable Puerto Rico's economic development," has recently created the Science, Technology and Research Trust Fund to help finance and develop research and development projects on the island. Other government-sponsored developments include the creation of the Small Business and Technology Development Center (SBTDC), the Grupo Guayacan (provides businesses with access to global private equity), the Procurement Technical Assistance Center (PTAC), The Puerto Rico Industry Investment Board (PRIIB), the Puerto Rico Manufacturing Extension Partnership Program (PRIMEX) and others.

While Puerto Rico is located in the Caribbean, it enjoys a U.S. style consumer culture, a U.S.-dollar based economy and U.S. rule of law. Puerto Rico nationals enjoy U.S citizenship and the local economy and culture are strongly tied to the mainland U.S.

## Limited Competition

Choice operates in dense urban/suburban communities that are fundamentally less competitive than typical U.S. cable markets.

- No overbuilder presence
- No telco video strategies
- No Verizon
- ILEC (PRTC) operates inferior network

Choice has an extremely strong competitive position as a result of its recent network upgrades and product improvements described above. Choice is the only cable operator in its markets. It faces no land-line video competition, there are no cable overbuilders, and the incumbent local exchange carrier (PRTC) does not offer any video product and, given the poor state of its network, it is unlikely to offer Video for the foreseeable future.

Choice's only video competition comes from DBS. While the DBS providers have historically offered consumers a compelling video alternative to Choice, the recent network upgrades and product improvements described above have made Choice's Video offering superior for the first time in its history. Choice's all-digital service delivers superior picture quality. By contrast, DBS picture quality suffers from Puerto Rico's tropical climate (rain fade) and low latitude (signal must pass through more atmosphere). The DBS operators' one-way "broadcast" technology is also incapable of matching Choice's newly launched VOD service which promises to be an especially important factor in Puerto Rico. Further, Choice's locally addressable network is better suited to delivering Spanish language and local content than DBS broadcast satellite technology.

Weller Capital

HIGHLY CONFIDENTIAL

Choice's only meaningful Internet access competitor is PRTC.[3] As described above, PRTC's legacy network is old and experiences frequent service interruptions and offers DSL to only a portion of Choice's service area. Moreover, PRTC's DSL product "is half as fast for $1 more." Given the poor state of PRTC's network, Choice expects to be able to maintain a wide margin of superiority for the foreseeable future.

Choice's Voice product will also be superior in quality and price to the PRTC's offering. Choice is confident that its Voice product will be a compelling alternative to the PRTC's offering and will greatly enhance Choice's overall sell rates and churn.

Choice also believes that it enjoys a competitive advantage in delivering customer service. Choice maintains local call centers and service representatives, while DBS providers use call centers domiciled on the mainland U.S. and markets their products through contractors. Local service is especially important in Puerto Rico given the island's specific culture and language.

## Consolidation Opportunities

Puerto Rico is ripe for consolidation. The densely populated island is served by three cable operators. These operators' service areas are nearly contiguous and their systems could be easily interconnected and served by one headend for a minimal cost. Choice's network and Liberty's network are already fiber linked and Management believes that Liberty and One Link are also fiber linked. Combining Choice with one or both of the other cable operators would generate substantial cost savings by eliminating redundant corporate and regional administrative functions, improving the efficiency of installation, service and maintenance operations, optimizing sales and marketing efforts, improving programming purchasing power and reducing future capital expenditures.



- ~75k subs
- 100% digital (no analog)

- Owner: Liberty Global
- ~110k subs
- 100% digital (550 MHz plant)
- 400 mile fiber ring

- Owner: MidOcean / Crestview
- ~140k subs
- 860 MHz plant

---

[3] Choice also competes with Islanet, a small local wireless Internet access provider  Islanet offers service in Mayaguez only and Choice estimates that it serves less than 2,000 subscribers.

HIGHLY CONFIDENTIAL

# Company Overview

HIGHLY CONFIDENTIAL

## RATE CARD

| Description | Rates for May-07 |
|---|---|
| *Video* | |
| Local Choice | $28.50 |
| Choice Pack | $48.45 |
| Top Choice Pack | $58.45 |
| Additional Extensions | $5.95 c/u |
| | |
| *Premium Channels* | |
| HBO (12 channels) | $13.95 |
| Showtime Unlimited (16 channels) | $12.95 |
| Cinemax (8 channels) | $12.95 |
| Starzl (13 channels) | $12.95 |
| Cine Latino (1 Channel) | $4.50 |
| | |
| *Digital Music Channels* | |
| Commercial | $24.95 |
| | |
| *Pay per view Services* | |
| Movies | $3.95 |
| Adult Content (8 hour block) | $7.95 |
| Movies - Ordered by subscriber | $2.00 |
| Events - Ordered by subscriber | $10.00 |
| | |
| *HDTV and DVR* | |
| Combined Service (HDTV/DVR) | $15.95 |
| DVR Service | $9.95 |
| Monthly Converter Charge | $8.95 |
| Combined Installation | $119.95 |

*Local Choice:* Choice's most basic Video service consists of 34 channels of video, including programming provided by local broadcast television stations, a limited number of satellite-delivered cable or mainland U.S. over the air broadcast networks, and public, educational and governmental access channels.

*Choice Pack:* Choice's intermediate Video service includes the Local Choice service described above, plus an additional 78 satellite-delivered cable networks such as ESPN, TNT, Fox News, and MTV and 30 digital music channels.

*Top Choice Pack:* Choice's top Video service includes the Choice Pack, as well as an additional 30 satellite-delivered cable networks such as Fox College Sports, BBC America, Lifetime, several Discovery channels, CNBC World, MTV Hits and 15 additional digital music channels.

*Premium Services:* Includes premium channels (e.g., HBO, Cinemax, Starz, Showtime) providing movies, original programming, live and recorded concerts, sporting events and other programming.

*VOD:* In April, 2007, Choice launched (system-wide) VOD, a fully interactive "On Demand" video service. Choice's VOD product currently offers approximately 600 recent movie titles per month, as well as several hundred hours of additional programming including Discovery On Demand, new movie release "extras", Kids Unlimited On Demand, Karaoke and Music On Demand and Event "extras." Choice plans to add additional VOD content, such as HBO On Demand, as demand for the service grows. Historically, Choice has experienced great success with pay-per-view products, with buy rates far in excess of industry norms. Choice believes that the popularity of PPV and VOD in Puerto Rico is due to its value conscious, family oriented culture.

*HDTV:* Choice "soft launched" HDTV in early 2006 and had 218 HDTV subscribers as of December 31, 2006. Choice provides a high definition digital signal, greatly enhancing the clarity and quality of the programming it offers. Choice's HDTV service offers subscribers 5 channels: ESPN, TNT, Discovery, Universal and National Geographic. Additional channel roll-outs are scheduled for January of 2008. Customers require an HDTV

Walter Capital…

HIGHLY CONFIDENTIAL

television in order to view HDTV channels in their intended high-quality format. HDTV is offered to all subscribers.

*DVR*: In early 2006 Choice "soft launched" DVR service, which allows customers to record video programs real-time to a hard drive for future viewing. Customers require a specific digital converter equipped with a hard-drive. DVR service is offered to all subscribers, with 321 customers subscribing to the service as of December 31, 2006.

## High-Speed Data

Choice's HSD product is the fastest and lowest cost Internet access service in all of its markets and Choice offers transmission rates up to twice its competitors' at lower prices. Choice is continuously increasing the speed and quality of its HSD services by investing in the latest equipment and expanding interconnectivity. For example, during 2006 Choice added additional unified bit rate, or "UBR", capacity and international bandwidth capacity and all HSD customers saw their Internet speed increase by 25% - 100%. Choice accompanied this service improvement with a $2.00 HSD rate increase which was well received.

| HSD Product Offering | Rate May-07 |
|---|---|
| *Residential Services:* | |
| 512 Kbps | $23.95 |
| 832 Kbps | $37.95 |
| 1.25 Mbps | $44.95 |
| 2.0 Mbps | $59.95 |
| 2.75 Mbps | $76.95 |
| | |
| *Commercial Services:* | |
| 512 Kbps | $85.00 |
| 832 Kbps | $105.00 |
| 1.25 Mbps | $125.00 |
| 2.0 Mbps | $129.95 |
| 2.75 Mbps | $164.95 |

## Voice

Voice is an untapped opportunity. Management is currently conducting a beta-trial of its Voice product that will provide service in several homes in all of its 31 municipalities. The trial is expected to be completed in the second quarter of 2008, when the Company plans a full commercial roll-out of its Voice service.

Choice's Voice product is an all-digital Voice over Internet Protocol, or "VoIP," service. Choice plans to offer unlimited Voice service to the mainland U.S., Canada and Puerto Rico for one low price ($45.95 / month) as well as an "island" calling plan for a rate ($24.95 / month). Choice plans to bundle its Voice offerings with a package of standard services such as voicemail, call waiting, caller ID, second line capabilities and others.

HIGHLY CONFIDENTIAL

# MARKETING

## Overview

Choice's sales and marketing effort includes the aggressive use of direct sales representatives ("DSRs"), a highly trained professional local call center, cable stores, innovative Kiosks located in high traffic malls, targeted direct mail and television, radio and newspaper advertising.

Choice's direct sales force of more than 175 highly motivated DSRs go through the Company's proprietary direct sales training program. Choice's call center is a modern facility that seats 41 professional customer service representatives ("CSRs"). Choice thoroughly trains each CSR upon hiring and throughout their career with the Company. CSRs receive merit based bonuses for beating various performance hurdles (sales, customer retention, abandoned phone calls, etc.). Choice's call center is comprised of local employees and service representatives, and does not include contractors. Choice also has five cable stores located in geographically key cities to best service customers. The stores are designed to handle all walk-in customer traffic including customer payment (in-person bill paying is very common in Puerto Rico), new sales, upgrades, voluntary disconnects, general inquiries and service problems. Choice also operates three innovative retail Kiosks in area malls. The new Kiosk format places a Choice retail and customer service location in high traffic areas. The new format allows specially-trained employees to be fully interactive with both passersby and existing customers requiring support services. Trained employees market Choice's products and provide attentive service to existing customers. Two of these Kiosks operate rent free in exchange for modest amounts of television advertising insertions.

Choice also maintains an active advertising and direct mail effort. For example, Choice targets approximately 275,000 color direct mail pieces to non customers each month and runs thousands of radio and TV spots each month. Choice also makes use of newspaper advertising and out of home media (banners, sales tents, etc.).

# CUSTOMER SERVICE

Choice is dedicated to distinguishing itself from its competition through superior customer service. Choice maintains local call centers and service representatives, while DBS providers use mainland U.S. and other foreign call centers. Choice's local service representatives are highly trained. Local service is especially important in Puerto Rico given the island's specific culture and language. Choice believes that the historically state-controlled PRTC has a reputation for poor customer service.

Choice has also completed or planned recent renovations for a few of its customer center locations. These renovations include enlarged waiting areas and improved facilities that are more business efficient and customer friendly. For example, Choice just enlarged the Aguadilla cable store's waiting area, developed additional personnel rooms and even added an outdoor eating facility. Additionally, Choice has just recently completed a new training center in its Ponce facility. Choice's goal is to always provide same day to three day service for installs, upgrades and trouble calls. By contrast, Choice believes that its competitors typically take one to two weeks to provide service. The Company believes that strong local customer support is a key consideration in choice of service providers.

Waller Capital

HIGHLY CONFIDENTIAL

## HEADCOUNT

| Job Function | Full-Time | Part-Time | Total |
|---|---|---|---|
| General & Administrative | 35 | - | 35 |
| Marketing / Training | 6 | - | 6 |
| Customer Care | 79 | 50 | 129 |
| Direct Sales | 52 | 145 | 197 |
| Technical | 60 | - | 60 |
| Total | 232 | 195 | 427 |

1. Part-time employees work between 20 and 25 hours per week

2. Roster as of April 4, 2007

## MANAGEMENT

### Executive Management

Choice has a strong management team of seasoned industry veterans. The team has a strong track record in the Puerto Rico cable and telecommunications markets.

### Edwin Stevenson
**President and General Manager**
Edwin is a lifelong resident of Puerto Rico and has been a telecommunications executive for over 10 years. He was previously the Vice President of Sales at Centennial Cable TV (now Choice), where he was the General Manager of one of Puerto Rico's largest systems. Edwin was instrumental in facilitating the transition from Centennial to Choice. Prior to Centennial Cable TV, Edwin was the Vice President of Sales for Centennial of Puerto Rico. Edwin also held senior level positions at ITT World Directories, The Quaker Oats Company and Frito Lay Snack Caribbean.

### Jose Espada
**Director of Finance**
Jose has been a senior level finance executive for 18 years. Prior to Choice, Jose was the controller at Rexnord Puerto Rico (a specialty components manufacturer), where he worked for 20 years. While there, Jose was responsible for implementing new initiatives to reduce operational costs.

### Jim Sweet
**Technical Plant Manager**
Jim has held senior level engineering positions at a variety of telecommunications companies over the past 25 years, including 11 years in Puerto Rico. His experience has been focused on managing the technical operations of cable companies, acting as both Plant and Engineering Manager. Most recently Jim worked at J.S. Construction, where he served as the Prime Contractor for Adelphia's San Juan rebuild project. Jim's experience also includes Atlantic Cable Group, Continental Cablevision, Nynex Cablecomms and Prestige Cable TV.

### Ivelisse Cruz
**Marketing and Programming Manager**
Ivelisse has held senior level marketing positions over the last seven years. Previously, she was at Pegasus Communications and Centennial Cable TV (both now Choice), and was previously at the U.S. Federal Emergency Management Agency (FEMA). While at Pegasus Communications, Ivelisse held the honor of being the industry's leadings sales producer of HSD service in all of Puerto Rico. Notable achievements at Choice include the restructuring of the Choice marketing division.

HIGHLY CONFIDENTIAL

## Soraya Zapata
### Customer and IT Director
Soraya has held senior level customer service and IT positions over the last 15 years. Previously, she was at Pegasus Communications, Centennial Cable TV and Cablevision of Mayaguez (all now Choice). While at Pegasus and Centennial, Soraya actively participated in the successful acquisitions of the Aguadilla and Ponce cable systems.

## Rafael Rodríguez Colón
### Call-Center Manager
Rafael has held senior level customer service positions over the last five years. Previously, he was at Pegasus Communications, Centennial Cable TV and Cable TV del Noroeste. While at Cable TV del Noroeste, Rafael became the Lead Customer Service Representative and was responsible for dispatch and data entry areas, and helped with daily reports and system data backups.

## Last Mile Communications
Choice's senior management team is supplemented with industry specialists from Last Mile Communications ("LMC"), a strategic management and consulting firm that focuses on the cable television and the telecommunications industry. The LMC team, lead by Peter Kahelin, is comprised of highly experienced telecom executives (12-24 years of industry experience) that are expert at navigating and operating cable and broadband operations. LMC specializes in improving operational efficiency and profitability of telecom companies at all stages. LMC was instrumental in facilitating the transition from Centennial and building the senior management team described above. Choice's LMC specialists are willing to consider remaining with Choice after a sale to provide ongoing management and/or transition services.

Waller Capital

HIGHLY CONFIDENTIAL

# Operating Markets

Waller Capital

HIGHLY CONFIDENTIAL

# OPERATING MARKETS

## OVERVIEW

### Introduction

Choice's market stretches from the southeastern coastal city of Patillas to the coastal town of Isabella in the northwest. The Choice market follows Highways PR-1 and PR-2, which run along the coast and are major highways for some of the largest communities on the island. The southern coast is home to important infrastructure projects, including the pending expansion of the Port of Ponce and the expansion of a commuter highway connecting San Juan in the north and Choice's footprint. A variety of industries, most notably pharma/biotech, petrochemicals, electrical, and shipping and transportation, have established major facilities within Choice's footprint. Choice's footprint is also home to two airports, a U.S. military base, major industrial parks and some of the largest shopping centers on the island.

Puerto Rico is a U.S. Commonwealth and is subject to U.S. rule of law. Its residents enjoy the benefits of U.S. citizenship and the local economy and culture are strongly tied to the mainland U.S. Overall, Puerto Rico has a U.S. style consumer culture with strong local traditions.

### Greater Ponce

Ponce is Puerto Rico's largest city outside the greater San Juan metro area and has a population of 186,000. Greater Ponce is Choice's largest service area and boasts the Mercedita airport, the Port of Ponce, numerous educational institutions and a variety of cultural attractions. The most significant pending industrial project in the area is the four-phase conversion of the Port of Ponce into an international shipping hub. The city, recognized for its strategic location and growing economical importance, will now be the focal point for one of the largest commercial shipping and transportation hubs in the Caribbean. The "Port of the Americas", will be capable of servicing vessels with a controlling depth of 50 feet and will handle up to 1.5 million TEU's (twenty-equivalent-units) per year. The port will also provide logistic support under the protection of a Foreign Trade Zone. Raw material, components and packaging can be transported tax free through these zones and items shipped abroad after processing are exempt from U.S. taxes. Total estimated investment will be $750 million and will create approximately 12,000 direct and indirect jobs in the region.

Mainland manufacturers are increasingly building facilities in the greater Ponce area, attracted by the improvements in transportation infrastructure and incentives provided by the Ponce Foreign Trade Zone. Companies with significant activities in the region include Accurate Solutions and Design, Bristol-Myers Squib, C.F. Corporation, Freedom Pharmacy, General Electric, J.M. Torres, Phasor Engineering, Ronin Shipbuilding Co., Rubber and Gasket Co. of Puerto Rico, Southern Plastics, Storage Technology, Vasallo Unlimited.

### The West Coast

Choice's western coastal region is home to some of the largest communities within Puerto Rico, including Mayaguez (pop. 100k), Aguadilla (pop. 66k), San German (pop. 37k) and Isabela (pop. 44k). These cities are connected by commuter Highway PR-2 and are a short drive from greater Ponce. Mayaguez, Puerto Rico's fourth largest city outside the greater San Juan metro area, is home to the Port of Mayaguez, the Eugenio Maria de Hostos Airport, and a variety of cultural attractions, including the only zoo on the island. Mayaguez is also a major and growing college town and the University of Puerto Rico - Mayaguez, the Eugenio Maria de Hostos Law School and the Pontiff Catholic University of Puerto Rico all have established campuses within the city. Aguadilla, the next largest city in the western region, is home to the Luiz Manoz Marin International Airport. This airport serves as the Caribbean hub to American Airlines and American Eagle and is currently undergoing major upgrades, including the construction of a new concourse, runway and other infrastructure to support increased traffic and activity.

Numerous mainland U.S. manufacturers have built facilities in the western region due to the abundance of high-skilled, bilingual labor and surrounding ports, airports and shipping highways. The most active industries include pharma/biotech, electrical, petrochemicals, shipping and transportation. Notable employers in the

Waller Capital

HIGHLY CONFIDENTIAL

region include Afa Plastics, Bristol-Myers Squibb, Eli Lilly, Engineering Research Dynamics Corp., General Electric, Infotech Aerospace Service, Mayne Pharma Puerto Rico, Phasor Engineering and Chevron-Phillips.

In addition, high-tech firms are increasingly establishing facilities within the area to take advantage of the growing high-skilled labor force stemming from numerous colleges and universities in the area. Hewlett-Packard, a leading manufacturer of computer electronic equipment, operates two plants in Aguadilla, and Northrop Grumman, a premier global defense and technology company, operates a plant in Santa Isabel. Three new industrial parks have recently been built within Choice's footprint to support the influx of these high-tech companies. They include the Jobos Industrial Park in Guayama, the Las Americas Technological and Industrial Park in Moca and the Guanajibo Industrial Park in Mayaguez. These government-sponsored development initiatives will also help drive local economic growth.

The western region is also enjoying the construction of new malls, shopping centers and variety of retail outlets that cater to growing consumer wealth. The Mayaguez mall, currently under construction, will be the third largest on the island.

## COMMERCIAL DEVELOPMENT INCENTIVES

In 1942, the Commonwealth of Puerto Rico established The Puerto Rico Industrial Development Company (PRIDCO) to promote and support Puerto Rico industrial development through a variety of business and tax initiatives. These initiatives have changed over time to adapt to growing Puerto Rico economy. Currently, these initiatives include:

- 7% maximum corporate income tax rate with some qualified companies paying as little as 2%

- 0-2% special corporate tax rate for "Pioneer Industries"

- A 200% super-deduction for research and development job training costs

- Accelerated depreciation for investment in buildings, machinery and equipment with unlimited loss carry forwards

- 100% deduction on real and personal property taxes during initial construction and first-year of operations

These incentives, as well as the region's well-educated, bilingual workforce, are attracting numerous business services to Choice's service area.

Choice's service area is also home to two Foreign Trade Zones ("FTZ"), including the largest, noncontiguous FTZ system in the U.S. FTZs provide incentives like the deferment of customs duties, excise taxes, inventory taxes and many others. The largest FTZ, based in Mayaguez and run by PRIDCO, operates five sub-zones in several island municipalities. Ponce boasts the Ponce Foreign Trade Zone Development Corporation, a development corporation of the Municipality of Ponce created to increase national and international trade in the southern part of the island.

## HIGHER EDUCATION

Puerto Rico is home to 25 accredited colleges and universities, 11 of which have campuses within Choice's footprint. Mayaguez is home to one of the largest college populations on the island, boasting three university campuses - The Antillean Adventist University (~1.0k students), the Facultad de Derecho Eugenio María de Hostos (~0.3k students) and the University of Puerto Rico -- Mayaguez Campus (~12.4k students). The University of Puerto Rico -- Mayaguez Campus (UPRM) is the Caribbean's leading science and engineering institution and the second largest University of Puerto Rico (UPR) campus. Other prominent UPR campuses within Choice's footprint are located in Ponce (~3k students) and Aguadilla (~1.5k students).

HIGHLY CONFIDENTIAL

## RECREATION AND TOURISM

Millions of tourists visit the island each year to enjoy the island's temperate weather and visually stunning landscapes. Puerto Rico's southern and western regions offer a variety of cultural activities including art galleries, fine dining, museums and theater. A variety of world-class beaches (e.g. Añasco, Cabo Rojo and Rincon) in the region also attract a consistent flow of tourists and beach-goers, most notably to the western coast. These beaches are home to numerous hotels/inns, water sports and other activities for the many tourists that regularly visit the western coastal region. Ponce also boasts numerous attractions, including two castles, the Ponce Museum of Art, the Serralles rum distillery (home of the Don Q, Captain Morgan, and Parrot Bay rums), the Ponce Cathedral, the "parque de bombas" (historical firehouse), a 100-foot observation tower which overlooks the city and 19th-century architecture in the blocks surrounding the central plaza. Mayaguez, the second largest city in the area, is home to the Nuestra Señora de la Candelaria Cathedral, the Plaza Colon, the Casa Grande Museum, a planetarium, the Yaguez theater, a zoo and a variety of other cultural destinations.

## SYSTEM DESCRIPTION

The core of Choice's network is a 190 mile fiber backbone that stretches the full length of Choice's service area, a contiguous string of southern and western Puerto Rico cities. Choice's fiber backbone was initially constructed in 2002 with 12 to 24 fibers in some areas and as little as two fibers in others. The original fiber backbone interconnected all of Choice's networks (Ponce, Aguadilla, Mayaguez and San German), with the intent to carry an all-digital signal and remove all analog signal from the Choice system. In 2006 choice built a new 190 mile high capacity fiber backbone. The 142 mile core of the backbone (Aguadilla to Santa Isabel) generally has 144 individual fibers (minimum of 48). The 48 mile edge of the backbone (Aguadilla to Quebradillas; Santa Isabel to Maunabo) generally has 48 to 60 individual fibers (minimum of 12). The fiber backbone has been designed so that reserve fiber capacity ranges from as many as 84 individual fibers in its core to six individual fibers on the outer edges. Choice strategically built this reserve capacity to provide for the future growth of residential advanced services as well as a nascent commercial business. This robust fiber backbone will allow Choice to retain competitive network superiority for years to come.

In 2006, the current management team successfully converted the plant to 100% digital and completely eliminated all analog signal from its system. Choice has also greatly expanded its network footprint. Choice increased homes passed from 307,065 at December 31, 2004 to 328,821 at December 31, 2006. All passings built since 2005 (about 6.3% of the current network by homes passed) are built at 750 MHz amplifier spacing with 25% of those amplifiers 750 MHz capable. Approximately ~88.7% of Choice's network (plant miles) is aerial, with the remaining portion underground.

With a few local exceptions, all video signals originate in the Aguadilla headend. Channel signals are delivered to Aguadilla's 17 satellite dishes (all are functional and in-use), and transmitted to Choice's digital conversion facility. The converted digital signal is then transported out to Choice's markets via Choice's fiber backbone. The satellites receive signals from local satellites for locally distributed programming, as well as satellites positioned above the mainland U.S. for nationally syndicated programming.

CONFIDENTIAL

OCEANO        ATLANTICO

MAR        CARIBE

Watler Capital

30

HIGHLY CONFIDENTIAL

## DEMOGRAPHICS

| Demographic Information | Choice's Footprint[1] |
|---|---|
| **Population** | |
| 2000 | 1,134,332 |
| 2005 | 1,168,361 |
| 2010E | 1,197,057 |
| *growth (2000-2005, annual average)* | *0.6%* |
| *growth (2005-2010, annual average)* | *0.5%* |

Source: Puerto Rico Office of the Census

1. Includes the following communities:

| | |
|---|---|
| Adjuntas | Maricao |
| Aguada | Maunabo |
| Aguadilla | Mayagüez |
| Añasco | Moca |
| Arroyo | Patillas |
| Cabo Rojo | Peñuelas |
| Coamo | Ponce |
| Guánica | Quebradillas |
| Guayama | Rincón |
| Guayanilla | Sabana Grande |
| Hormigueros | Salinas |
| Isabela | San German |
| Jayuya | Santa Isabel |
| Juana Díaz | Villalba |
| Lajas | Yauco |
| Las Marías | |

Waller Capital

HIGHLY CONFIDENTIAL

# Financial Information

Waller Capital

HIGHLY CONFIDENTIAL

# FINANCIAL INFORMATION

## RESULTS OF OPERATIONS

### Consolidated Financial Information

| (FYE Dec, $000s) | 2004 | 2005 | 2006 | 2007E | 2008E | 2009E | 2010E | 2011E | |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | |
| Video | 49,023 | 50,143 | 49,010 | 51,139 | 53,592 | 59,101 | 65,391 | 72,366 | |
| HSD | 2,167 | 3,554 | 6,608 | 12,203 | 20,877 | 28,567 | 33,285 | 37,278 | 3 |
| Voice | - | - | - | - | 735 | 5,480 | 9,882 | 12,980 | 18 |
| **Total Revenue** | **51,190** | **53,696** | **55,618** | **63,342** | **75,204** | **93,127** | **108,558** | **122,636** | 1 |
| growth | | 4.9% | 3.6% | 13.9% | 18.7% | 23.8% | 16.6% | 13.0% | |
| **Direct Expenses** | | | | | | | | | |
| Video | 16,039 | 17,290 | 16,762 | 18,630 | 20,595 | 23,894 | 27,081 | 30,717 | 1 |
| HSD | - | - | - | - | 2,068 | 2,657 | 3,329 | 3,728 | 2 |
| Voice | - | - | - | - | 353 | 2,348 | 3,953 | 4,795 | 13 |
| Other | 6,846 | 7,318 | 7,909 | 8,535 | 9,282 | 10,094 | 10,977 | 11,937 | |
| **Total Direct Expenses** | **22,884** | **24,608** | **24,671** | **27,164** | **32,317** | **39,192** | **45,350** | **51,176** | 1 |
| **Gross Profit** | **28,306** | **29,089** | **30,947** | **36,178** | **42,887** | **53,935** | **63,209** | **71,457** | 1 |
| margin | 55.3% | 54.2% | 55.6% | 57.1% | 57.0% | 57.9% | 58.2% | 58.3% | |
| **Less:** | | | | | | | | | |
| Sales and Marketing | 3,619 | 2,989 | 2,610 | 4,398 | 4,888 | 6,053 | 7,056 | 7,971 | 11 |
| General and Administrative | 12,106 | 7,707 | 8,801 | 8,689 | 9,424 | 10,254 | 11,165 | 12,164 | 1 |
| **EBITDA** | **12,581** | **18,382** | **19,837** | **23,110** | **28,574** | **37,628** | **44,988** | **51,321** | 2 |
| margin | 24.6% | 34.2% | 35.7% | 36.5% | 38.0% | 40.4% | 41.4% | 41.8% | |
| **CAPEX** | | | | | | | | | |
| Growth | 4,629 | 5,876 | 11,098 | 7,587 | 11,899 | 11,423 | 11,006 | 10,781 | |
| Maintenance | - | 1,893 | 4,650 | 2,657 | 1,757 | 1,718 | 1,832 | 1,827 | |
| **Total CAPEX** | **4,629** | **7,769** | **15,849** | **10,243** | **13,647** | **13,141** | **12,838** | **12,609** | |
| **Free Cash Flow** | **7,952** | **10,613** | **4,188** | **12,867** | **14,927** | **24,487** | **32,150** | **38,712** | 31 |
| ARPU | | 61.0 | 52.8 | 70.3 | 80.7 | 94.4 | 103.8 | 110.9 | 12 |
| **Operating Summary (end of period)** | | | | | | | | | |
| Homes Passed | 307,065 | 316,852 | 326,821 | 326,896 | 336,396 | 343,896 | 351,396 | 356,896 | 2 |
| Basic (All-Digital) | 73,150 | 73,456 | 74,617 | 75,532 | 79,782 | 84,682 | 89,582 | 94,778 | 5 |
| % of Homes Passed | 23.8% | 23.2% | 22.7% | 23.0% | 23.7% | 24.6% | 25.5% | 26.4% | |
| HSD Subscribers | 8,007 | 14,758 | 27,777 | 48,708 | 69,498 | 83,498 | 95,498 | 105,498 | 21. |
| HSD Homes Passed | 172,020 | 250,812 | 308,207 | 326,896 | 336,396 | 343,896 | 351,396 | 356,896 | 2, |
| % of Basic Subscribers | 10.9% | 20.1% | 37.2% | 64.5% | 87.1% | 98.6% | 106.6% | 111.3% | |
| % of Homes Passed | 2.6% | 4.7% | 8.4% | 14.8% | 20.7% | 24.3% | 27.2% | 29.4% | |
| Voice Subscribers | - | - | - | - | 10,000 | 25,000 | 36,000 | 44,000 | 53. |
| Voice Enabled Homes Passed | 172,020 | 250,812 | 308,207 | 326,896 | 336,396 | 343,896 | 351,396 | 356,896 | 2: |
| % of Basic Subscribers | - | - | - | - | 12.5% | 29.5% | 40.2% | 46.4% | |
| % of Homes Passed | - | - | - | - | 3.0% | 7.3% | 10.2% | 12.3% | |

Waller Capital

HIGHLY CONFIDENTIAL

# HISTORICAL BALANCE SHEET DATA

| | Audited | Audited | Unaudited |
|---|---|---|---|
| ($000s, December Year End) | May 31, 2005 | May 31, 2006 | Dec. 31, 2006 |
| **ASSETS** | | | |
| Cash and cash equivalents | 7,753 | 921 | 742 |
| Accounts receivable (net) | 6,075 | 7,117 | 6,824 |
| Restricted cash | 15,339 | - | - |
| Prepaid expenses | 702 | 655 | 460 |
| Total current assets | 29,869 | 8,693 | 8,026 |
| Property, plant & equipment (Net) | 51,734 | 40,351 | 32,983 |
| Intangible assets, net | 57,691 | 56,876 | - |
| Goodwill | 46,229 | 46,229 | - |
| Debt issue costs, net | 2,531 | 4,311 | - |
| Other assets | 39 | 2,138 | 108,437 |
| TOTAL ASSETS | 188,092 | 158,598 | 149,446 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | |
| Accounts payable | 240 | 2,765 | 2,377 |
| Accrued interest payable | 923 | 1,539 | - |
| Accrued programming fees | 2,995 | 1,945 | - |
| Other accrued expenses | 3,083 | 3,054 | 8,874 |
| Unearned revenue | 3,707 | 3,944 | - |
| Subordinated promissory note payable to parent company | 15,856 | - | - |
| Total current liabilities | 26,804 | 13,247 | 11,251 |
| Long term debt | 80,000 | 102,050 | 107,100 |
| Deferred taxes | 8,457 | 8,457 | 8,457 |
| Other liabilities | 1,625 | 1,141 | - |
| TOTAL LIABILITIES | 116,887 | 124,895 | 126,808 |
| Common stock | nm | nm | nm |
| Additional paid-in capital | 78,425 | 58,074 | 58,075 |
| Accumulated deficit | (7,219) | (24,372) | (35,437) |
| TOTAL STOCKHOLDERS' EQUITY | 71,206 | 33,703 | 22,638 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | 188,092 | 158,598 | 149,446 |

Waller Capital

HIGHLY CONFIDENTIAL

## PROJECTED FINANCIAL INFORMATION

### Forward Looking Statements

This Confidential Information Memorandum includes certain projections and forward-looking statements provided by Choice with respect to its anticipated future performance. Such projections and forward-looking statements reflect various assumptions of management concerning the future performance of Choice, and are subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond the control of Choice. Accordingly, there can be no assurance that such projections and forward-looking statements will be realized. The actual results may vary from the anticipated results and such variations may be material. No representations or warranties are made as to the accuracy or reasonableness of such assumptions or the projections or forward-looking statements based thereon. Only those representations and warranties that are made in a definitive written agreement relating to a transaction, when and if executed, and subject to any limitations and restrictions as may be specified in such definitive agreement, shall have any legal effect as between the parties to such agreement.

### Discussion of Projection Methodology

The projections for the years 2007 thru 2011 were compiled from Choice's detailed operating budget for 2007 and Choice's four-year plan (2008-2011). The 2007 operating budget and four-year plan factor in the market characteristics of each operating franchise, the current cost structure and the revenue and subscriber growth opportunities that exist in each local market.

Although Choice's budget and forecast for each operating market contain certain market specific drivers, the following general discussion applies.

### Revenues

The major drivers of revenue growth over the forecast horizon are increases in HSD penetration (from 8.4% of homes passed in 2006 to 29.4% of homes passed in 2011), the development of a VOD business (20.1% buy rate of all basic video customers by 2011) and the development of a Voice business (12.3% of homes passed by 2011), increases in Video penetration (from 22.7% of homes passed in 2006 to 26.4% of homes passed in 2011), as well as very conservative rate increases each year on all products. For example, Video ARPU is forecast to increase at the annual rate of 3.6% over the forecast horizon (2007-2011) and HSD and Voice ARPUs are forecast to grow 3.9% and 1.9% annually, respectively (Voice forecast from 2009).

### Direct Expenses

Primary cost drivers include costs associated with the growth of the company's Video, HSD, VOD and Voice businesses. Also adding to the increases yearly will be normal CPI increase on goods, increases in rents, etc.

Programming costs are projected to increase at a compound annual growth rate of 13.3% per year. These cost increases are based on historical price increases from programmers for the delivery of satellite delivered expanded basic programming, increased VOD buy rates from year to year and are partially driven by the growth in digital and premium customers, as well as the addition of new programming as it is required. HSD and Voice expenses are conservatively projected to grow 21.3% and 138.6%, respectively, over the forecast period (from 2008) due to additional bandwidth required by HSD and Voice. Other expenses are projected to grow 8.7% over the forecast period (from 2007) due primarily to increases in total subscriber volume, and include operating payroll (customer service representatives and technicians) and taxes, utilities, vehicle mileage and maintenance, pole rent, repairs and maintenance, copyright fees and drop connects and disconnects.

Waller Capital

HIGHLY CONFIDENTIAL

## Sales and Marketing

Choice forecasts sales and marketing expenses to grow at a compound annual growth rate of 16.0% per year primarily to support the continued growth of Video services, rapid HSD services growth, the launch and rapid growth of VOD and VoIP services. Expenses incurred will be commission related, acquisition campaigns and retention programs.

## General and Administrative

Increases include rents, utilities, employee salaries and benefits as the company staff level increases to support customer growth, bank fees associated with customer billing and deposits, legal fees, customer management system costs, bad debt expense, as well as normal CPI increase on cost of goods and services.

## CAPEX

Primary CAPEX drivers will include network expansion, additional roll-out of advanced services, rapid customer growth in all services including VoIP and the related increase in customer premise units, electronics to support the customer growth such as UBRs for Voice, HSD and VOD enhanced capacity to sustain increased buy rates, VoIP licenses for each net customer and general plant maintenance. Total CAPEX is forecast to grow at a compound annual rate of 5.3%. The bulk of this growth is due to increases in growth related CAPEX to build new plant (~7,500 homes/year) and roll-out ongoing service improvements.

Waller Capital Partners

HIGHLY CONFIDENTIAL

# Appendix

Walter Capital...

HIGHLY CONFIDENTIAL

# APPENDIX

## CHANNEL LINEUPS





HIGHLY CONFIDENTIAL



Waller Capital

HIGHLY CONFIDENTIAL

**Opciones de Servicio Mensual**

| | |
|---|---|
| Local Choice | $28.50 |
| Choice Pack | $48.45 |
| Top Choice Pack | $58.45 |
| Extensiones Adicionales | $5.95 cu |

**Canales Premium**

| | |
|---|---|
| HBO (12 canales) | $13.95 |
| Showtime Unlimited (16 canales) | $12.95 |
| Cinemax (8 canales) | $12.95 |
| Starz! (13 canales) | $12.95 |
| Cine Latino (1 canal) | $ 4.50 |

**Canales de Música Digital**
**Music Choice (45 canales)**

| | |
|---|---|
| Comercial | $24.95 |

**Pay Per View Services**

| | |
|---|---|
| Películas | $ 3.95 |
| Canales para adultos (bloque de seis horas) | $ 7.95 |
| Películas-Cargo por ordenar a través de Servicio al Cliente | $ 2.00* |
| Eventos-Cargo por ordenar a través de Servicio al Cliente | $10.00* |

**Cargos por Servicio**

| | |
|---|---|
| Cargo Mensual por el convertidor principal | $ 4.85 |
| Cargo Mensual por convertidores adicionales | $ 5.95 |
| Instalación residencial de servicios de cable TV | $59.95 |
| Instalación comercial de servicios de cable TV | $69.95 |
| Instalación no convencional (más de 250' de distancia) | Varía según distancia |
| Instalación soterrada | $82.52 |
| Instalación de conexión adicional | |
| Con Instalación Inicial | $20.00 |
| Después de Instalación Inicial | $25.00 |
| Instalación de Convertidor adicional | $20.00 |
| Convertidor o modem perdido, dañado o robado | $300.00 |
| Servicio de transferencia de servicio | $25.00 |
| Servicio de re-conexión por computadora | $10.00 |
| Reconexión de la toma | $25.00 |
| Reubicación de la conexión | $25.00 |
| Instalación de VCR/DVD al momento de la instalación | $10.00 |
| Después de la Instalación original | $25.00 |
| Cambio de Servicio (downgrade) | $ 5.00 |
| Visita de servicio | $35.00 |
| Visita para entrega de control remoto | $ 7.50 |
| Cargo por retraso de pago | $10.00 |
| Cargo por visita de cobro al hogar | $15.00 |
| Cargo por cheques devueltos | $10.00 |
| Cargo por referido a agencia de cobros | $20.00 |

* Adicionales al costo del evento.

**Choice Cable TV**

**High Definition TV & Digital Video Recorder**
**HDTV/DVR**

| | |
|---|---|
| Servicio Combo HD/DVR | $15.95 |
| Servicio de DVR | $ 9.95 |
| Cargo mensual convertidor HD/DVR | $ 8.95 |
| Instalación de Combo HD/DVR | $119.95 |

**Servicios de Internet Residencial**
**Opciones de Servicio Mensual**

| | |
|---|---|
| Velocidad 512k | $23.95 |
| Velocidad 832k | $37.95 |
| Velocidad 1.25Mb | $44.95 |
| Velocidad 2.0Mb | $59.95 |
| Velocidad 2.75Mb | $76.95 |
| Precio de Instalación | $124.00 |
| Venta de Cable MODEM | $75.00 |
| Instalación de Ethernet Card | |
| Para PC | $25.00 |
| Para Laptops | $45.00 |

**Servicios de Internet Comercial**
**Opciones de Servicio Mensual**

| | |
|---|---|
| Velocidad 512k | $85.00 |
| Velocidad 832k | $105.00 |
| Velocidad 1.25Mb | $125.00 |
| Velocidad 2.0Mb | $129.95 |
| Velocidad 2.75Mb | $164.95 |

**Localidades**

**Aguadilla**
• Carretera 110
Lunes a Sábado 8am-5pm
• Aguadilla Mall

**Guayama**
• San Vicente Mall
Carretera 3 Km. 140.2
Lunes a Sábado 8am-5pm
• Guayama Mall

**Mayagüez**
• Vista Verde Plaza
Lunes a Sábado 8am-5pm

**San Germán**
• San Germán Plaza
Ave. Casto Pérez
Lunes a Sábado 8am-5pm

**Ponce**
• Ponce Mall
Avenida by Pass
Lunes a Sábado 9am-5pm
• Plaza del Caribe

**Centro de Servicio**
Lunes a Sábado 8am-9pm
1-877-717-0400

Toda tarifa de Choice Cable TV esta sujeta a un 3% de
cargo adicional como impuesto de la Junta Reglamentadora
de Telecomunicaciones de Puerto Rico, a impuestos
municipales y a un impuesto de $0.05 de la FCC.

Efectivo 1ro de enero de 2007

Waller Capital

Exhibit C

Waller Capital Partners, LLC
30 Rockefeller Plaza, Suite 4350, New York, NY 10112
P. 212-632-3600 | F. 212-402-1771

Waller Capital PARTNERS, LLC

CONFIDENTIAL

May 21, 2007

Nicolas Massard
Spectrum Equity Investors
One International Place
Boston, MA 02110

Dear Nicolas:

Thank you for your continuing interest in a possible transaction involving Puerto Rico Cable Holding Company Inc. (d/b/a Choice Cable TV, "Choice" or the "Company"). As you know, Waller Capital Partners, LLC ("Waller Capital") has been engaged as exclusive financial advisor to Choice in connection with the sale of the Company (the "Transaction"). We would like to invite you and certain others to submit preliminary written indications of interest in a Transaction. Choice and its owners may use these indications of interest to determine which parties may be invited to proceed with a further review of the Company.

The existing lender for Choice is offering a pre-arranged acquisition debt facility for the Transaction in an amount up to 8.0x LQA EBITDA. Please contact Garrett M. Baker or Jeffrey A. Brandon (212-632-3600) at Waller Capital for more information regarding the acquisition debt facility.

If you wish to proceed with a further, detailed review, we request that you submit a written indication of interest on or before 5:00 PM Eastern Daylight Time on June 5th, 2007 by facsimile or email to:

Waller Capital Partners, LLC
30 Rockefeller Plaza
Suite 4350
New York, New York 10112
Phone:    212-632-3600
Fax:       212-402-1771

Attention:
Christopher N. Erwin
Analyst
cerwin@wallercc.com

Your written indication of interest should include:

(i)    an overview of your organization's strategic rationale for the Transaction;

(ii)    your valuation of the Company (on a debt- and cash-free basis);

(iii)    details of any key assumptions you may have made in connection with your valuation;

(iv)    a description of your financing for the Transaction, including the level of commitment and the timing of the financing and any related contingencies, if applicable;

(v)    a detailed description of all additional due diligence information you will require prior to submitting a final, binding offer;

(vi)    a statement of the time you will require to submit a final, binding offer;

(vii)    a description of the level of review within your organization that your indication of interest has received and the level of further review that would be necessary prior to submitting a final, binding offer;

(viii)    a list of any necessary corporate, shareholder, regulatory or other approvals required to consummate the Transaction;

(ix)    an indication of any other material conditions that you anticipate;

(x)    the name, address, email address and telephone and fax numbers of a contact person who is available to answer questions regarding your indication of Interest;

(xi)    the names, addresses, email addresses and telephone and fax numbers of your financial and legal advisors and external financing sources, as applicable, and

(xii)    an indication of three dates during the weeks of June 11th and June 18th that your team would be available to attend a management presentation in Puerto Rico.

Waller Capital will contact interested parties shortly after receiving the preliminary indications of interest to notify each party as to whether or not they will be invited to conduct further and final due diligence. In assessing the qualifications of the parties who have submitted preliminary proposals, the Company, the Company's owners and Waller Capital will consider, in their sole discretion, such factors as they deem appropriate, including (without limitation) the indicated preliminary valuation level, the party's financial capability, and its ability to consummate a Transaction in a manner that best satisfies the objectives of the Company's owners. The Company reserves the right to enter into negotiations with any interested party or parties at any time or to otherwise modify or terminate the Transaction process at any time. Neither the Company, its owners nor Waller Capital will be obligated to state any reason for declining consideration, at any time, of any party, partnership or group.

Access to additional business, financial and legal information will be provided to selected parties, during the second and final phase of due diligence. Each selected party will also be supplied with an agreement specifying the terms upon which the Company intends to enter into a Transaction. Waller Capital will request fully financed, binding, definitive acquisition offers upon completion of due diligence.

Each party will bear all costs of its investigation and evaluation of a Transaction, including the fees and disbursements of its own counsel and advisors. Further, the terms of the confidentiality agreement which you have entered into with the Company shall continue to be in full force and effect.

If you decide not to submit an indication of interest, please return all documents and other materials furnished to you by or on behalf of the Company which constitute Confidential Information (as defined in the confidentiality agreement you have entered into with the Company).

The Company reserves the right to, but has no obligation to, amend any Confidential Information (written, oral or otherwise) provided to any party.

**If you have any questions regarding the procedures detailed in this letter, or regarding the Transaction generally, please contact the undersigned at Waller Capital. Waller Capital will be available throughout the process to respond to your inquiries. In no event should any management member, employee, customer, vendor, creditor or owner of the Company be contacted directly.**

Thank you for your consideration and cooperation.

Sincerely,


Garrett M. Baker                    Jeffrey A. Brandon
Partner, Managing Director          Director

# Exhibit D

Waller Capital Partners, LLC
30 Rockefeller Plaza, Suite 4550 | New York, NY 10112
P. (212) 632.3600

Waller Capital PARTNERS, LLC

## CONFIDENTIAL

June 23, 2007

Nicolas Massard
Spectrum Equity Investors
One International Place
Boston, MA 02110

Dear Nicolas:

Thank you for your continued interest in a possible transaction involving Puerto Rico Cable Holding Company Inc. (d/b/a "Choice Cable TV," "Choice" or the "Company"). Waller Capital Partners, LLC ("Waller Capital") is pleased to inform you of the timing and procedures for submitting a definitive and binding offer (the "Offer") for an acquisition of Choice.

Choice, with the assistance of its advisors, will consider all Offers received, with the goal of executing a definitive agreement with the party that submits the Offer which best meets its objectives. In evaluating the Offers, Choice will consider any matters it deems appropriate, including, but not limited to: (i) the purchase price and form of consideration; (ii) certainty and timing of closing of the transaction; (iii) certainty of financing commitments; (iv) the regulatory approval process associated with a transaction with the prospective purchaser; and (v) the extent and nature of proposed revisions to the Stock Purchase Agreement ("Agreement"), a draft of which will be available though the on-line data room starting on Tuesday, June 26, 2007.

We request that your Offer conform to the following guidelines and procedures, which will assist in evaluating and comparing Offers on a consistent basis. Departures from these guidelines may impact the evaluation of your Offer.

1. In advance of submitting your Offer, please submit any proposed revisions to the Agreement, excluding the proposed purchase price, on or before 5:00 p.m., Eastern Time, on July 13, 2007 to:

> Glenn D. West
> Weil Gotshal & Manges LLP
> 200 Crescent Ct., Suite 300
> Dallas, TX 75201
> Telephone: (214) 746-7780
> Facsimile: (214) 746-7777
> gdwest@weil.com

Prior to submitting your proposed revisions to the Agreement, you are encouraged to contact Glenn D. West to discuss any material changes, for purposes of clarification and not

negotiation. Any proposed revisions should be typed and marked to show changes from the Agreement previously provided to you.

2. Choice's advisors may provide you with feedback on your proposed revisions to the Agreement prior to the due date of your Offer.

3. Please submit your Offer on or before 5:00 p.m., Eastern Time, on July 23, 2007 (please note that the Company, in its sole discretion, reserves the right to extend or otherwise change these deadlines) by facsimile or email to:

> Christopher Erwin
> Waller Capital Partners, LLC
> 30 Rockefeller Plaza
> Suite 4350
> New York, NY 10112
> Telephone: (212) 632-3600
> Facsimile: (212) 402-1771
> cerwin@wallercc.com

a) Your Offer should include a version of the Agreement marked to show all of your subsequent revisions, following your review of any Choice feedback to your initial revisions. It should also include your **best and final** purchase price (on a cash and debt free basis);

b) Your Offer should include a statement that, upon acceptance of your Offer, you are ready to execute the Agreement in the form submitted;

c) Your Offer must specify the legal name of the proposed acquirer. Your Offer should also identify the relationships of all parties participating in the acquisition and, as appropriate, include the identities of the equity holders of the proposed acquirer;

d) Your Offer should include a description of the sources of financing required to complete the transaction and provide support for your financial ability to consummate the transaction. Any third party financing contemplated by your Offer should be fully committed by one or more reputable financing sources and your Offer should include copies of detailed and executable binding commitment letters from those financing sources, which must identify all commitment conditions. Please provide a list of contacts with telephone numbers of each of your financing sources with whom such arrangements can be discussed in detail. By submitting your Offer, you will be authorizing Choice's advisors to contact these individuals without prior notice to confirm the availability of funds for the transaction;

e) All due diligence by you or your financing sources must be completed prior to the submission of your Offer. Please inform representatives at Waller Capital by July 12, 2007 in writing of any remaining due diligence requirements that you or your financing sources require. There should be no due diligence condition as part of your Offer or as a condition to any financing commitment provided to you;

f) All required corporate approvals, including authorization of your company's Board of Directors or Investment Committee, should be obtained prior to submitting your Offer. Your Offer should state that such approvals have been obtained;

g) Your Offer should specify the date on which you expect to close the acquisition as well as indicate any governmental, regulatory, shareholder or other approvals required by the purchaser and an estimate of the period of time required to secure such approvals;

h) Your Offer must state that it will remain open through August 20, 2007 unless rejected in writing by Choice prior to that time; and

i) Please include the names and contact information (including business, cell, home telephone and fax numbers, and email addresses) of those persons we should contact when responding to or clarifying your Offer, including contact information for your financial and legal advisors.

Choice reserves the right, in its sole discretion and at any time, to modify the terms and conditions of the invitation made by this letter without sending notice to prospective purchasers of any change or withdrawal. Choice also reserves the right to reject, at any time, any and all Offers in their sole discretion. Choice further reserves the right to consider any and all factors in the determination of the successful Offer and to deal with any party individually or simultaneously with other prospective purchasers. Neither the Company nor any of its officers, directors, shareholders, employees, representatives or affiliates will have any liability or obligation to any prospective purchaser as a result of the rejection of any Offer or the acceptance of another prospective purchaser's Offer. Until a definitive written agreement is executed and delivered by all parties thereto, Choice will not have any obligations to any prospective purchaser with respect to the sale of the Company, and, following the execution and delivery of a definitive written agreement, the Company's only obligations to the purchaser will be those set forth in such definitive written agreement.

The terms of this invitation are subject to the confidentiality agreement and any amendments thereto, relating to this proposed transaction, which has been previously executed and delivered by you.

By submitting an Offer, a prospective purchaser acknowledges that it is relying solely upon its own independent investigation and evaluation of the Company. Although the information that has been provided to you to date has been prepared in good faith, the Company and its advisors make no representations or warranties with respect to the accuracy or completeness of such information. The only representations and warranties with respect to the Company will be those set forth in the definitive written agreement executed by the parties.

Each party will bear all costs of its own investigation and evaluation of the Company, including the fees and disbursements of its own counsel and advisors.

Under no circumstances are you to contact the Company's management or personnel (including Last Mile Communications) without the express permission of the Waller Capital. Except with respect to your submission of revisions to the Agreement (which shall be directed to Glenn D. West as described above), Waller Capital shall remain your sole point of contact and is available

to discuss matters relating to these procedures prior to the submission of your Offer so as to provide guidance as to the form and content of such Offer. Please direct any questions regarding the guidelines contained herein to Garrett Baker or Jeff Brandon (212-632-3600).

On behalf of Choice, we would like to thank you for your continued interest in this opportunity and hope that it leads to a successful transaction.

Sincerely,


Garrett Baker                                    Jeff Brandon
Partner, Managing Director                       Director
Waller Capital Partners, LLC                     Waller Capital Partners, LLC



cc: Glenn D. West

Attachment

# Exhibit E



July 31ˢᵗ, 2007

Garrett Baker
Waller Capital Partners, LLC
30 Rockefeller Plaza
Suite 4350
New York, NY 10112
Phone: (212) 632-3600
Fax:    (212) 402-1771
gbaker@wallercc.com

**Via email.**

Dear Garrett:

Spectrum Equity Investors (*"Spectrum"* or *"we"*) is pleased to submit this letter confirming our interest expressed in the proposal (the *"Proposal"*) for the acquisition (the *"Transaction"*) of Puerto Rico Holding Company, Inc. (*"Choice"* or the *"Company"*) submitted on July 23ʳᵈ, 2007.

As requested by your client, we are confirming the following points of the Proposal:

*Price*

We propose to acquire the Company for $185.0 million in cash (the "Purchase Price"), based on a cash free/debt free enterprise plus an adjustment mechanism for working capital at closing.

*Structure*

We propose to structure the transaction as a stock deal.

*Escrows*

The general escrow amount should be 10% of the base purchase price. In addition to the general escrow amount, appropriate special escrows should be created covering exposure of the Company in legal proceedings and exposure of the Company for unpaid taxes. Please note that we are doing due diligence to derive the appropriate size of these escrows, which should be limited to actual exposure.

*Taxes*

We appreciate the responsiveness of the Company to our ongoing due diligence on property taxes. We believe that the review of the documents requested by us this week will allow us to take a final view on that matter.

2

*Management Team*

We understand that your client has expressed an interest in having our management team taking over the operations before closing (after HSR clearance). Having backed this team for several years we are convinced of their first-class operational skills and therefore welcome this idea. Consequently, we are interested in discussing the terms and logistics of such an arrangement directly with your client.

*Other*

This letter and our Proposal remain subject to completion of confirmatory tax, legal and accounting due diligence to our satisfaction and we have provided in our Proposal for your review detailed lists of our outstanding due diligence items. Of course, our Proposal is also subject to finalization and execution of the definitive Agreement in a form mutually acceptable to you and us.

\* \* \*

The terms and conditions of this Proposal (including the identity of Spectrum) are confidential and are not to be disclosed to anyone other than the Company, its shareholders and their legal counsel and other agents and representatives who need to know such information in connection with the transaction. This letter is not intended to be a contract. The parties shall not be legally obligated by any of the terms hereof unless and until the terms of this letter are embodied in definitive documentation in form and substance satisfactory to the parties, and executed and delivered by them.

We strongly believe that our Proposal provides the best outcome for Choice and its shareholders. Please feel free to contact at your convenience Bill Collatos or Nicolas Massard at (617) 464-4600 for further clarification. We are looking forward to your response.

Sincerely,

Spectrum Equity Investors

William P. Collatos
Founder & Senior Managing Director

Exhibit F

Puerto Rico Cable Holding Company Inc,
c/o HM Capital Partners LLC
200 Crescent Court, Suite 1600
Dallas, Texas 75201

**CONFIDENTIAL**

August 3, 2007

Spectrum Equity Investors V, LP.
One International Place,
29th Floor
Boston, MA 02110

Ladies and Gentlemen:

      In connection with the consideration by Spectrum Equity Investors V, LP.("Spectrum" or "you"), Puerto Rico Cable Holding Company Inc. (the "Company"), and HMTF Fund V Cayman, L.P. ("Fund V"), in respect of a potential transaction (the "Transaction") involving the Company and its subsidiary (the "Company"), you and the undersigned agree as follows:

      Based on your letter dated July 31, 2007 to Waller Capital Partners, LLC, in which you set forth certain terms of your proposal to acquire the Company (the "Confirmatory Letter"), we are prepared to enter into exclusive discussions with you concerning a Transaction. During the period commencing on the date hereof and ending on the earlier to occur of (a) August 23, 2007 and (b) the date on which you confirm in writing that the terms proposed by you in the Confirmatory Letter are no longer acceptable to you in all material respects, it being agreed that you will promptly notify the Company upon determining that such terms are not acceptable to you in all material respects (such period, the "Exclusivity Period"), the Company and Fund V shall not, and shall cause their respective agents, representatives, consultants and employees (collectively, the "Representatives") not to communicate with, furnish any information to, participate in any discussions or negotiations relating to or solicit or enter into any agreements or understanding in respect of an Acquisition Proposal with any other party. An "Acquisition Proposal" means any proposal, inquiry or offer from any person other than Spectrum or any of its affiliates (i) regarding the transfer or sale of assets (other than in the ordinary course of business) or stock of the Company or (ii) with respect to any merger, business combination, consolidation with the Company.

      Spectrum, the Company and Fund V understand that this letter agreement does not create any obligation on either of our parts with respect to consummation of a Transaction. No contract or agreement providing for any Transaction shall be deemed to exist between us unless and until a definitive agreement with respect thereto has been executed and delivered. This letter agreement may be executed in one or more counterparts, each of which will be deemed an original, but both of which taken together will constitute one and the same agreement. This letter agreement

DA1:493-43705\@KQFD51.DOC\68592.0003

shall be governed by New York law, without reference to its conflict of laws principles that would result in the application of another jurisdiction's laws. This letter agreement shall not be assigned by a party hereto without the prior written consent by the other parties hereto.

If the foregoing accurately reflects your understanding, please so indicate by executing and returning to the undersigned one copy of this letter agreement, which will constitute and evidence our agreement with respect to the matters addressed herein.

Very truly yours,

PUERTO RICO CABLE HOLDING COMPANY INC.,

By: _____
Name:
Title:

HMTF FUND V CAYMAN, L.P.,

By: _____
Name:
Title:

Agreed and accepted as of
the date written above:

SPECTRUM EQUITY INVESTORS V, LP.

By: _____
Name:
Title:

Exhibit G

**Puerto Rico Cable Holding Company Inc.**
**c/o HM Capital Partners LLC**
**200 Crescent Court, Suite 1600**
**Dallas, TX  75201**

September 12, 2007

Waller Capital Partners, LLC
30 Rockefeller Plaza
Suite 4350
New York, NY 10112

Attn: John W. Waller III

Ladies and Gentlemen:

     Reference is made to that certain letter agreement (the "Engagement Letter") dated as of April 3, 2007, by and between Waller Capital Partners, LLC ("Waller") and Puerto Cable Holding Company Inc. and its affiliates (the "Company"), pursuant to which the Company engaged Waller to, among other things, provide assistance in connection with a Transaction (as defined in the Engagement Letter).  This letter serves to terminate Waller's engagement pursuant to Section 8 of the Engagement Letter, to be effective upon receipt of this notice in accordance with the Engagement Letter.  The Company requests that Waller send a final invoice detailing any unpaid out-of-pocket expenses that it has incurred in connection with its engagement at its earliest convenience.

     Very truly yours.

     PUERTO RICO CABLE HOLDING
     COMPANY INC.

     By: _____
        Name:
        Title:

Exhibit H

Privileged and Confidential
Subject to Contract

October 4th, 2007

## NON-BINDING PROPOSAL ("Proposal") FOR $40 MM INVESTMENT INTO PUERTO RICO HOLDING COMPANY INC.

| | |
|---|---|
| **The Company:** | Puerto Rico Holding Company, Inc. ("Choice" or "Company"). |
| **The Parties:** | Spectrum Equity Investors V, L.P. and affiliates ("Spectrum"). HMTF FUND V CAYMAN, L.P. and affiliated funds ("HMTF"). |
| | Spectrum and HMTF hereafter referred to collectively as the "Parties" and individually as a "Party". |
| **The Objective:** | The Parties seek to recapitalize Choice through a $40 MM investment by Spectrum. The Parties also wish to hire a new management team, led by Steve Simmons (Chairman) and Jim Holanda (CEO), to manage the day-to-day operations of Choice. The Company will enter into new contracts with the new management team. |
| **Transaction Description:** | The Parties intend to recapitalize Choice through: |

(i)     Cash investment from Spectrum;
(ii)    Pay-down of part of the current bank debt ("Credit Facility");
(iii)   Renegotiation of key terms of the Credit Facility.

**Sources and Uses of Proceeds:**

| Sources: | | Uses: | |
|---|---|---|---|
| Spectrum Investment | 40.0 | Pay Down Credit Facility | 15.0 |
| | | Cash on Hand | 25.0 |
| **Total** | **$40.0** | **Total** | **$40.0** |

**Type of Securities[1]:** In exchange for a $40 MM cash investment, Spectrum will receive a redeemable preferred equity instrument ("Pref") senior to all existing equity securities of the Company. The Pref will be entitled to an annual dividend of 17.5%, which if not paid will be added to the principal of the Pref on each anniversary. The Pref will be redeemed at the earlier of a sale or the fifth anniversary of the Pref.

Spectrum will also receive 51% of each series and class of equity securities of the Company.

**Board Representation:** Choice's board of directors shall consist of five members, designated as follows:

(i)     Three directors designated by Spectrum;
(ii)    One director designated by HMTF; and
(iii)   The individual serving as the Company's chief executive officer.

**Management Option Pool:** Up to [ ]% of ownership in Choice (on a fully diluted basis).

---

[1] Subject to legal and tax structuring analysis.

**Tag-Along Right:**    If Spectrum wishes to sell or transfer more than 50% of the equity interests it directly and indirectly owns in Choice to a third party ("Transferee"), HMTF shall be offered the right to transfer a pro-rata amount of its equity interests in Choice to the Transferee on the same price, terms and conditions as Spectrum.

**Drag-Along Right:**    If Spectrum decides to sell or transfer at least 50.1% of the equity interests it directly and indirectly owns in Choice to a third party ("Transferee"), Spectrum shall have the right to require HMTF to sell on a pro rata basis the same percentage of its equity interests in Choice and HMTF shall be obliged to sell, to the Transferee for the same price (except to the extent necessary to reflect Spectrum's liquidation preference under the Pref), terms and conditions its shares and shall exercise good faith efforts in such sale, provided that before the fifth anniversary, Spectrum can only exercise its drag-along right if HMTF recovers its unrealized investment cost of $[  ] MM.

**Pre-emption Rights:**    Customary pro rata pre-emptive rights for all Parties in relation to the issuance of any future securities of Choice excluding management shares and other customary exclusions.

**Right-of-first-refusal:**    Spectrum shall have a right of first refusal on any transfer of equity securities by HMTF to a third party.

**Liquidity Rights:**    The Parties undertake to use reasonable efforts to initiate a capital markets event ("CME") (IPO, sale, merger or other) that provides liquidity to the Parties no later than the fifth anniversary post closing of this transaction. Any CME is subject to market conditions as determined by an independent major investment bank.

**Other Rights:**    Customary information rights and registration rights.

**Amendments:**    The corporate charter and the other documentation relating to the investments and related transactions (stockholder agreements, registration rights agreements, etc.) may be amended with the approval of the Company and the holders of a majority in interest of each class of the Company's equity securities; provided however, that any such amendment that adversely affects the rights of one or more persons (the "Adversely Affected Persons") in a manner that is materially different from its effect upon the rights of other persons shall not be effective as to those Adversely Affected Persons not consenting to such amendment unless approved by a majority in interest of the Adversely Affected Persons.

**Material Conditions:**    
- Satisfactory renegotiation and amendment of the Credit Facility;
- Delivery of Choice's audited financial statements (including balance sheet, income statement, changes in stockholders' equity and cash flows) for 2007, presented in conformity with GAAP with principles consistently applied (including an unqualified opinion by the audit firm);
- Satisfactory execution of all documents to complete the transaction, including a Purchase Agreement (with customary representations, warranties and indemnification) ; and
- Satisfactory regulatory and third party required approvals.

**Fees and Expenses:**    Choice will reimburse Spectrum for all reasonable 3rd party fees and expenses.

**Confidentiality:**    The Parties acknowledge that the terms of this Proposal are confidential and agree that no Party shall disclose the transactions contemplated by this Proposal, the pendency of discussions between the Parties or the contents of this Proposal, in any case, without the consent of the other Party.

**Applicable Law:**    This Proposal will be governed and construed under the laws of the State of Delaware.

**Disclaimer; Non-Binding Proposal:**    This Proposal and its terms are non-binding and do not represent a commitment to invest or proceed with any transaction. Except for the paragraphs above regarding Confidentiality and Applicable Law (which are intended to be legally binding), no legally binding obligations will be created until the completion of due diligence satisfactory to Spectrum, the receipt of all necessary corporate approvals and the negotiation and execution of definitive documentation that is mutually acceptable to all Parties, including customary representations, warranties and indemnification.

IN WITNESS WHEREOF, the parties hereto have executed this Proposal on the date first above written.

Spectrum Equity Investors V, L.P.                HMTF.
By:                                              By:
Title:                                           Title:

Exhibit I

[Waller Capital Partners Letterhead]

March 31, 2008

Spectrum Equity Investors V. L.P.
One International Place
29th Floor
Boston, Massachusetts 02110

Puerto Rico Cable Holding Company Inc.
c/o HM Capital Partners, LLC
200 Crescent Court, Suite 1600
Dallas, Texas 75201

Re:    Waller Capital Partners, LLC/Puerto Rico Cable

Ladies and Gentlemen:

We refer you to the letter agreement, dated as of April 3, 2007 (the "Engagement Letter"), between Waller Capital Partners, LLC ("Waller") and Puerto Rico Cable Holding Company Inc. (the "Company"). We also refer you to the letter, dated as of September 12, 2007, from the Company to Waller terminating Waller's engagement under the Engagement Letter (the "Termination Letter"). Capitalized terms used below, unless otherwise defined, have the meanings set forth in the Engagement Letter.

Waller has received and reviewed (i) the Agreement and Plan of Merger, dated as of December 11, 2007, among PPR Media LLC ("Parent"), PR Media Acquisition Inc., the Company, Hicks, Muse, Tate & Furst Equity Funds V, L.P. and the other parties identified therein (the "Merger Agreement") and (ii) the Limited Liability Company of Parent (the "LLC Agreement")

Based on Waller's review of the Merger Agreement and the LLC Agreement, Waller is entitled to a Transaction Fee. Section 8 of the Engagement Letter provides that if the Company terminates Waller's engagement, the Company will pay Waller a Transaction Fee for certain events occurring within six months after such termination. These events include the entry by the Company into a definitive agreement relating to a transaction *similar* to the Transaction and involving the subject matter of the Transaction.

10945967.3

As noted above, the Company terminated Waller's engagement under the Engagement Letter on September 12, 2007. The Company executed the Merger Agreement, a definitive agreement that is, at a minimum, for a transaction similar to the Transaction contemplated by the Engagement Letter and involving the subject matter of the Transaction, within the six months following that termination. Accordingly, the Company owes Waller a Transaction Fee.

Because you have not provided Waller with any documents related to this similar transaction other than the Merger Agreement and the LLC Agreement, Waller cannot determine with certainty the amount of the Transaction Fee owed by the Company. Based on information currently available to Waller, Waller believes the aggregate value involved in such transaction is at least $160 million, calculated as follows:

| | |
|---|---|
| Debt (last balance as of May 31, 2007) | $110.9 million |
| HM Capital's Capital Contribution (per LLC Agreement) | $9.7 million |
| Spectrum Equity's Capital Contribution (per various conversations) | $40.0 million |
| Total Value | $160.6 million |

Accordingly, it appears the Company owes Waller a Transaction Fee of approximately $1,606,000 (calculated as 1.0% of the Total Value, as defined in the Engagement Letter). Further, Waller incurred $44,539.59 of out-of-pocket costs and expenses in connection with its services. To fully and finally resolve this issue, Waller will accept payment of $1,650,539. If you disagree with this amount, please provide Waller with all documents related to the transactions contemplated by the Merger Agreement as soon as possible. Waller will treat those documents as confidential in accordance with the terms of the Confidentiality Agreement dated as of March 11, 2008, among Waller, Spectrum Equity Investors V, L.P. and the Company.

Sincerely,

WALLER CAPITAL PARTNERS, LLC

By: _____

Garrett Baker
Managing Partner

**Exhibit J**

# EDWARDS ANGELL PALMER & DODGE LLP

111 Huntington Avenue  Boston, MA  02199   617.239.0100  *fax* 617.227.4420  eapdlaw.com

Steven M. Cowley

617.951.2283
*fax* 617.439.4170
scowley@eapdlaw.com

June 6, 2008

**VIA EMAIL
CONFIRMATION BY MAIL**

Christopher M. Mason, Esq.
Nixon Peabody LLP
437 Madison Avenue
New York, New York  10022-3111

      Re:    Puerto Rico Cable Holding Company, Inc. ("PRCHC")/Waller Capital Partners,
             Inc. ("Waller")

Dear Mr. Mason:

As you are aware, this firm represents PRCHC. I write in response to your letter addressed to
Christopher Mensoian, dated May 12, 2008.

The representation in your letter that "it does not seem that there is a viable, good faith argument
that the transaction contemplated by the December Agreements is anything but a transaction
similar to the Transaction and involving the subject matter of the Transaction ..." is very difficult
for PRCHC to understand. As Waller acknowledges, a "Transaction", as defined in the April 3,
2007 engagement letter between Waller and PRCHC (the "Engagement Letter"), did not occur.
The transaction that Waller was engaged to effect on behalf of PRCHC was to involve the sale of
Puerto Rico Cable Acquisition Company Inc.'s ("PR Cable's") stock or assets, in whole or in
part, such that the original investors would receive compensation in one form or another for the
transfer of PR Cable, or its assets. Specifically, Waller's potential Transaction Fee was to be
calculated based on "the total consideration paid to the Company [PRCHC] or its investors"
based on the sale or merger of PR Cable. Waller did not succeed in accomplishing such a
transaction. Not only did Waller not effect a transaction that saw the investors in PRCHC
receiving compensation for their investment, those investors had to pursue a transaction of an
entirely different nature -- one that saw them suffering a substantial dilution of their position.

The Engagement Letter does not contemplate that Waller would be paid a Transaction Fee based
on any and all transactions that PRCHC might undertake. Instead, the parties contemplated
Waller would earn a Transaction Fee only if a specifically defined Transaction occurred, or
something similar -- and to be similar, at a minimum, the investors who hired Waller would have
to receive something of value for selling or transferring some or all of the assets in which they
invested. Instead, what actually occurred is that the company had to be recapitalized and,
without getting any of their money out, the investors saw their overall position in their

EDWARDS ANGELL PALMER&DODGE LLP

Christopher M. Mason, Esq.
June 5, 2008
Page 2

investment substantially diminished. In short, the hoped for payout from a sale of PR Cable never occurred; there was no consideration of any kind paid to PRCHC or its investors as a result of any transaction involving PR Cable's stock or assets. Instead, additional investment in PRCHC was necessary to keep the company operating. Given that PRCHC and its investors did not accomplish a deal similar to what they hoped Waller could help them accomplish, PRCHC cannot understand why Waller nevertheless claims to be entitled to the contingent Transaction Fee. Your letter provides no explanation of any kind that would assist PRCHC in understanding Waller's position. It merely assumes the question away. So, again, PRCHC requests that you explain the conclusion that the investment deal that actually occurred is "similar" to the specific Transaction that Waller was engaged to pursue.

Moreover, Waller has never provided any explanation for how its calculation of a claimed $1,606,000 fee comports with the Engagement Letter's definition of "Total Value". On its face, Waller's claim appears to simply ignore the specific contract language. For example, PRCHC understands and believes that Waller is aware that only $19,862,928.38 PRCHC's debt was extinguished in the December 2007 transaction; the balance remains outstanding. Should Waller claim not to be aware that such debt remains outstanding, I have enclosed a copy of the current amendment to the credit agreement showing that the credit facility is still in place. (That document constitutes "Confidential Information," as defined in the Confidentiality Agreement by and among Waller Capital Partners, LLC, Puerto Rico Cable Holding Company Inc., and Spectrum Equity Investors V, L.P., dated March 11, 2008, is being provided to Waller in connection with the Waller Review, as defined in the Confidentiality Agreement, and shall be subject to the terms and conditions of the Confidentiality Agreement.) Please explain Waller's position in light of the continuation of the majority of the outstanding debt. Similarly, please explain Waller's position that "Total Value" is to include HM Capital's additional capital contribution, in light of the express requirement in paragraph 8 of the Engagement Letter that any fee to Waller post termination will be based only on certain defined transactions "with third parties introduced by Waller to the Company, or where Waller was involved." Presumably, Waller does not contend that it introduced HM Capital to PRCHC, or that it was involved in HM Capital's participation in the LLC agreement.

Finally, your representation that Spectrum and PRCHC have refused to provide documents concerning the December 2007 transaction is inaccurate. Without obligation to do so, PRCHC and Spectrum voluntarily provided to Waller the two main agreements underlying that transaction. PRCHC and Spectrum are not aware of any document requested by Waller that they refused to provide, and your letter does not identify any request for a document that was refused by Spectrum or PRCHC.

EDWARDS ANGELL PALMER&DODGE LLP

Christopher M. Mason, Esq.
June 5, 2008
Page 3

Sincerely,

Steven M. Cowley

cc: Nicolas Massard
    Peter J. Barrett, Esq.
    Christopher M. Mensoian, Esq.